# Richmond

## FORD MOTOR COMPANY v. UNEMPLOYMENT COMPENSATION COMMISSION OF VIRGINIA.

January 15, 1951.

Record No. 3726.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*Williams, Cocke & Tunstall* and *Lawson Worrell, Jr.,* for the appellant.

*J. Lindsay Almond, Jr., Attorney General,* and *Kenneth C. Patty, Assistant Attorney General,* for the appellee.

MILLER, J., delivered the opinion of the court.

The ultimate question presented in this case is whether certain employees at the Ford Motor Company's assembly plant in Norfolk, Virginia, are entitled to unemployment compensation. The assembly line employees of that plant were laid off from May 11, 1949, through June 7, 1949, by reason of a partial shut down necessarily caused by inability to secure automobile parts to be used in the assembly of motor vehicles. Certain office employees and workmen in the parts and maintenance departments and at the power house were not affected by the shut down.

A correct answer to this problem requires an interpretation of section 5 of the Virginia Unemployment Compensation Act, as amended by Acts of the General Assembly, 1948, ch. 171, p. 356, at p. 370 (now section 60-47, Code, 1950), and a determination of whether the stoppage of work resulted "because of a labor dispute at the factory, establishment or other premises at which" the workmen were last employed. The pertinent paragraphs of section 60-47 follow:

"(d) For any week with respect to which the commission finds that his total or partial unemployment is due to

a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he is or was last employed, provided that this subsection shall not apply if it is shown to the satisfaction of the commission that—

"(1)   He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

"(2)   He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which stoppage occurs, any of whom are participating in or financing or directly interested in the dispute.

"Provided, that if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each · such department shall, for the purposes of this subsection, be deemed to be a' separate factory, establishment, or other premises."

The Unemployment Compensation Commission of Virginia granted an allowance of benefits to the employees at the Ford assembly plant in Norfolk whose employment had been suspended. Upon appeal by the Ford Motor Company, an interested party, to the Corporation Court of the city of Norfolk, the commission's findings and award were affirmed and the workmen have been paid their compensation. It was conceded at bar that under the facts of this case the payments may not be recovered from them. Yet if the claims allowed be held to have been invalid, the funds so paid are not chargeable to the employer's account. On the other hand, the employer's contributions to the unemployment fund are increased proportionately with the valid compensable unemployment of its employees. Sections 60-49, 60-73, Code, 1950. So though the workmen have been paid their compensation as provided for by the statute and it may not be recovered, we do not think the matter is moot, and the decree of the corporation court is now rightfully before us for review.

The principal office and manufacturing plants of the Ford Motor Company (a Delaware corporation) are located at Dearborn, Michigan. It is engaged in the manufacture and sale of Lincoln, Mercury and Ford motor vehicles. What is known as its Rouge plant, in which parts for the assembly of these three makes of vehicles are manufactured, is situated in Dearborn. A central department for purchase of parts not manufactured by it is also maintained at Dearborn. Parts manufactured elsewhere are shipped to the Rouge plant and by it allotted, distributed and shipped as needed to its various assembly plants in other places. One of the units or buildings in the Rouge plant is called "B Building", the activities of which are devoted to assembling Mercury and Ford automobiles and trucks. The company has established and also now maintains numerous assembly plants in other states, and elsewhere, in which one or more of these three makes of motor vehicles are assembled. Several of these plants are devoted wholly to the assembly of Ford automobiles and trucks, one of which is located at Norfolk, Virginia. Another in which Lincoln cars are assembled is at Detroit, Michigan, in the Dearborn area. Many others are scattered throughout the United States, with one in Canada and some abroad. All parts and supplies used in the assembly of Ford vehicles at the Norfolk assembly plant (except certain minor finishing items) are obtained from the Rouge plant in Dearborn, where they are either manufactured or through which they are channeled by the production division at that location.

The assembly unit in B Building at the Rouge plant is identical in operation with the Norfolk assembly plant with the exception that the latter assembles only Ford automobiles and has a parts department. Both operate by a system which conveys the units of work to and from the employees.

Though an office and sales force are maintained at the Norfolk plant, they are subject to the overall control of the general office at Dearborn. None of the parts required to assemble motor vehicles are manufactured in Norfolk. They are secured from the Rouge plant. In fact, the parts

manufactured at and obtained from the latter plant could not be procured elsewhere. Regular and continued operation at the Norfolk plant is dependent upon prompt and continuous receipt of parts from Dearborn. The shipments made to Norfolk from Rouge are upon a schedule that affords a supply for only a short period. Cessation of regular shipments would necessarily cause lay-off of workmen on the assembly line and discontinuance of operations at Norfolk when the parts on hand were exhausted which would ordinarily occur in about a week or less.

Funds received from sales of motor vehicles or from other sources by the Norfolk plant are deposited daily in a Treasurer's Account in the National Bank of Commerce at Norfolk. These funds are thereafter subject to the complete and exclusive control of the treasurer's office at Dearborn. Funds for operation of the local plant incident to its weekly payroll and daily operating expenses are secured from the local depository out of a special account made up of funds forwarded to the bank from Dearborn. The manager, sales manager and resident comptroller in Norfolk are employed on a salary basis and receive their pay direct from the Dearborn office. Employment and separation of employees are accomplished by the local management, subject, however, to approval by the central office at Dearborn.

All employees in the Ford plants within the United States are members of the International Union United Automobile, Aircraft and Agricultural Implement Workers of America, herein called UAW-CIO. They are subject to a master labor employment contract executed and existing between Ford Motor Company and UAW-CIO. No person may secure or retain employment with the Ford Motor Company without becoming and remaining a member of a local union and membership in the local automatically brings about membership in the International UAW-CIO. This International Union is the collective bargaining agent with certain immaterial exceptions for all member employees of the Ford Motor Company within the United States and all local unions are chartered by the International Union. Dues of the

members of each local union are assessed by and paid to the local unions in their respective areas. But the local unions are required to pay sixty-five cents a month for each dues-paying member to the International Union, which remittances are allocated as directed by International's constitution. Part of this money is set aside to make up a special fund called the International Strike Fund to be used "exclusively for the purpose of aiding local unions engaged in authorized strikes" upon vote of the International Executive Board. Under provisions of the International Union's constitution only the International President and the International Executive Board have authority to declare a general strike in the Ford industry. In case of a local labor dispute decision to strike is initiated in the local union and must be upon 2/3 vote of the members voting on the question. To consummate a local strike approval of International must be secured. Thus International, in the final analysis, can control the calling of such a strike because it must approve it. And once called, International UAW-CIO has complete control and it may order a return to work by the employees when it so decides.

The rate of pay for all union members was agreed upon by the parties to the master labor agreement executed between UAW-CIO and the Ford Motor Company. That agreement likewise controls the hiring, dicipline, discharge or lay-off of employees. Under it, settlement of all grievances and disputes arising from the relationship of employer and employee is provided for and by it all questions of seniority rights are determined. It should, however, be said that seniority rights at the Norfolk plant extend to and relate only to workmen at that plant.

Local Union 600 of the UAW-CIO is composed of the employees at the vast Rouge Plant. Employees of the Lincoln Assembly plant at Detroit are members of Local Union 900, and the employees of the Norfolk assembly plant belong to Local Union 919. Some weeks prior to May 5, 1949, those members of Local 600 employed in B Building complained that the speed of the conveyor system

was excessive and injurious to the health and safety of the workmen. As a consequence of this contention, a dispute arose between that Union and the company. The dispute was not settled and on May 5, 1949, it resulted in a strike by Local 600 at the Rouge plant and by Local 900 at Detroit and all employees at those two plants ceased work. However, this strike which was instituted and authorized by the local unions could not and did not actually materialize until it was approved by UAW-CIO's Executive Board. Nor was the strike limited to the workmen in B Building where the grievance arose, but all members of Local 600 struck. This resulted in a shut down in the entire Rouge plant. It further appears from the record that had the strike at Rouge been limited solely to the employees of B Building, which the Ford Motor Company sought to have done, it would not have injuriously affected the Norfolk assembly plant. Nor did the strike in Local 900 at the Lincoln assembly plant affect the Norfolk plant. Yet, due to the fact that the entire Rouge plant, including the parts-producing units, was shut down, the Norfolk assembly plant was unable to secure parts for the conduct of its assembly lines and in about six days it was thus forced to cease its assembly operations. No complaint was made by Local Union 919 in Norfolk; nor did any strike occur or strike vote take place there. In fact the Norfolk plant was not wholly shut down. There was employment for some of its workers and certain members of Local 919 not engaged on the assembly line continued to work in the parts department, maintenance department and at the power house. Those laid off by the partial shut down were engaged in assembling motor vehicles. They were forced to cease work for no fault of their own. No part of the "International Strike Fund", which is contributed to by Local 919 as well as by all other local unions, was actually used in behalf of Local 600 during this strike. However, all local unions, including 919, were kept informed by UAW-CIO of the progress of the strike, and the presidents of local unions were advised of the nature of

the strike by a letter from the president of Local 600, and support and assistance asked of all union members.

The strike was settled on May 29th through an arbitration agreement between Ford Motor Company and the UAW-CIO and the Rouge plant resumed operation on May 31st. When the shipment of parts had continued for several days the Norfolk plant was enabled to reopen, which occurred on June 8th.

The arbitration agreement specifically applied to the current strike at the Rouge and Detroit plants. Yet as the Collective Bargaining Agreement applied alike to all employees in their several grades of work, the result of the arbitration inured to the benefit of all assembly plant workers.

Plaintiff in error contends that the Norfolk assembly plant and the Rouge plant are so closely integrated as to constitute one establishment within the meaning of section 60-47 of the Virginia Unemployment Act. The Unemployment Compensation Commission concedes that insofar as efficient management and productive operation are concerned, the Norfolk plant is integrated and closely associated with and controlled by the central office which is maintained at the Rouge plant at Dearborn. It, however, insists that insofar as the workmen are concerned, the Norfolk plant is separate and distinct from the Rouge plant. In this connection, it is pointed out that the employees at Norfolk are members of Local Union 919 that has no connection with Local 600 at Rouge except that they are both members of an international union with whom the Ford Motor Company entered into contractual relations. The local employees are hired and discharged by the local officials and their seniority rights, though governed by the master agreement, are determined upon the local level. The members of Local 919 did no act towards calling the strike, nor could they prevent or terminate it. The dates on which the two plants (Rouge and Norfolk) shut down and reopened did not coincide. The Norfolk plant was closed for a week after the strike had been settled.

Claims to compensation by employees at various as-

sembly plants have been made as a result of shut downs brought about by this strike, and litigation in several States has arisen. The Unemployment Compensation statutes in both Georgia and New Jersey are identical with the Virginia Act and that of Minnesota substantially the same. Cases have been decided by the respective appellate courts of those States upon the issue here involved. In *Ford Motor Co.* v. *Abercrombie* (Ga.), 62 S. E. (2d) 209, the conclusion was reached that employees of the assembly plant located in Georgia were not entitled to compensation. The opposite result was reached by the Supreme Courts of New Jersey and Minnesota in the respective cases of *Ford Motor Co.* v. *New Jersey Department of Labor and Industry*, 7 N. J. Super. 30, 71 A. (2d) 727, and *Nordling* v. *Ford Motor Co.* (Minn.), 42 N. W. (2d) 576. The provisions of the Minnesota statute pertinent to the issue involved and upon which the decision hinged are slightly different from those of the Virginia Act. There the language to be construed is because of a strike or other labor dispute "at the establishment in which he is or was last employed" whereas the corresponding phrase of the Virginia statute is because of a labor dispute "at the factory, establishment, or other premises at which he is or was last employed." However, we think the effect of the language in each act is the same. In each instance, the right to compensation hinges primarily upon what is meant by the words "establishment in (at) which he is or was last employed."

The word "establishment", coupled as it is in the Virginia Act with the words "factory" and "other premises", means, we think, the place of business where the worker was employed. Nor is it, in our opinion, intended to widen and extend the area or territorial scope beyond that encompassed by the companion words "factory" and "other premises", but rather to make more inclusive and thus broaden the type of enterprise or business covered by these associate words. The words "factory", "establishment", and "premises" each characterizes and designates the kind of place at which the employees work and not the manner of its

operation. *Walgreen Co.* v. *Murphy*, 386 Ill. 32, 53 N. E. (2d) 390, and *Tucker* v. *American Smelting, etc., Co.*, 189 Md. 250, 55 A. (2d) 692.

In *General Motors Corp.* v. *Mulquin*, 134 Conn. 118, 55 A. (2d) 732, at p. 736, it is aptly said that:

"The social evil, however, which this type of legislation was designed to ameliorate is not confined to factorial origin. It occurs in banks, theaters, hotels and the vast mercantile trades, not one of which, quite manifestly, falls within the classification of a factory. By embodying in the phrase the word 'establishment', the legislative intent was to broaden the field of operation and extend the beneficence of the act to those employed in places other than factories, excepting, of course, those whom the act expressly excludes." This reasoning and construction is approved in *Ford Motor Co.* v. *New Jersey Department of Labor and Industry, supra.*

On the other hand, if the word "establishment" be given the meaning and effect sought to be attributed to it by appellant, the companion words "factory" and "other premises" become superfluous.

In the cases of *Ford Motor Co.* v. *New Jersey Department of Labor and Industry, supra,* and *Nordling* v. *Ford Motor Co., supra,* in construing the phrase or language used and in attempting to ascertain the legislative intent, the courts gave due consideration to the general unity of the Ford Motor Company's industry in the United States, the functional integration of the management and operation of the several plants, and the physical proximity of the units and plants. However, those factors were not deemed decisive of the question of whether or not the assembly plants in those States and the Rouge plant constituted one establishment. Many other circumstances were considered in determining whether the plant in question was in fact a separate factory or establishment from the Rouge plant insofar as employment was concerned.

Legislative acts of this character which provide funds for those temporarily unemployed are remedial in character. They should be liberally construed so that those

justly entitled to compensation may not be denied, and the purpose of the legislation thus effectuated.

In our opinion, the facts heretofore recited when considered in the light of the proviso to section 60-47, which reads: "Provided, that if in any cases separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each department shall, for the purposes of this subsection, be deemed to be a separate factory, establishment or other premises," makes it evident that the legislature intended that the Norfolk assembly plant be considered as a separate and distinct plant from other similar plants including the Rouge plant. We find no factual justification in the circumstances in evidence or legislative intent in the enactment that warrants any other conclusion.

The Unemployment Compensation Act was intended to provide temporary financial assistance to workmen who became unemployed without fault on their part. The statute as a whole, as well as the particular sections here involved, should be so intepreted as to effectuate that remedial purpose implicit in its enactment. When its purpose is kept in view, we cannot agree that managerial and operational integration and functional cooperation upon the official level are to be the chief factors upon which employment status and employees' rights are to be determined. Our problem is, in the final analysis, to recognize the remedial aim and purpose of the Act and then interpret and construe the language and apply it to the facts proved. In doing this, we do not think that the contractual obligations and relations brought about through execution of the master labor contract by Ford Motor Co. and UAW-CIO may be considered as determining whether or not the Norfolk plant and the Rouge plant constitute and are one establishment within the meaning of the statute. Those plants either constitute one establishment or separate establishments regardless of whether the master labor contract is or is not in force. The circumstances of employment, rather than those of manage-

ment and operation, are of primary importance in determining the unity and integration, or the lack of unity and integration, of the plants. The accumulative weight and effect of these circumstances, we think, are sufficient to show that the Norfolk assembly plant is separate from the Rouge plant. No labor dispute or strike was fomented or participated in by the local union to which the claimant employees belong, nor was there any labor dispute on the premises, at the plant, or in the establishment where they were actually employed. The labor dispute and resultant strike were in fact and in reality at and in Dearborn. The most that can be said is that the management and operation of the vast and far-flung Ford Motor Industry is so integrated and synchronized that a serious strike at its headquarters and in its principal plants at Dearborn must in time affect the entire industry and cause the shut down of plants and other establishments wherever situated. The dependence of one or more plants in this great industry upon the home office and principal manufacturing establishment does not, however, necessarily make of the entire industry one plant or one establishment.

The decree is affirmed.

*Affirmed.*