Barbara AUSTIN, Plaintiff–Appellee,

v.

Sandra BERRYMAN; Patrice Johnson; Joseph Hayes; Ralph Cantrell, Defendants–Appellants,

National Employment Law Project, Inc., Amicus Curiae.

No. 88–3948.

United States Court of Appeals, Fourth Circuit.

Argued July 6, 1988.

Decided Dec. 6, 1988.

Rehearing In Banc Granted Jan. 26, 1989.

J. Steven Sheppard, III, Asst. Atty. Gen. (Mary Sue Terry, Atty. Gen., Richmond, Va., on brief), for appellants.

Martin Douglas Wegbreit, Castlewood, Va. (Hugh F. O'Donnell, Client Centered Legal Services of Southwest Virginia, Inc., St. Paul, Va., on brief), for appellee.

Elizabeth Athos, Tenafly, N.J., James Williams, Nat. Employment Law Project, Inc., Abington, Va., on brief, for amicus curiae.

Before WINTER, Chief Judge, and MURNAGHAN and SPROUSE, Circuit Judges.

SPROUSE, Circuit Judge:

Sandra Berryman, Acting Chief Appeals Examiner, Patrice Johnson, Special Examiner, Joseph Hayes, Assistant for Commis-

sion Appeals, and Ralph Cantrell, Commissioner, all of the Virginia Employment Commission of the Commonwealth of Virginia, appeal from the judgment of the district court in favor of Barbara Austin. When Austin resigned her job in Salem, Virginia, to move to Castlewood, Virginia, with her husband, she applied for unemployment benefits. The Commission decided that she was ineligible for benefits, basing its decision on a provision of the Virginia unemployment compensation statute that singles out employees who voluntarily quit work to follow a spouse to a new locality.[1] Austin then brought the underlying action in the district court. She claimed, among other things, that the Virginia statute violated her first amendment right to the free exercise of religion and her fundamental marriage rights protected by the due process clause of the fourteenth amendment.

The district court held that the statute infringed upon incidents of marriage protected by the fourteenth amendment and was facially unconstitutional. Pursuant to that holding, it enjoined the Commission from enforcing the statute against any married person solely because he or she resigned a position to follow a spouse. It also held that, as applied to Austin, the statute violated her first amendment right to the free exercise of religion. *Austin v. Berryman*, 670 F.Supp. 672 (W.D.Va.1987). Believing itself bound to do so by our decision in *Brown v. Porcher*, 660 F.2d 1001 (4th Cir.1981), *cert. denied*, 459 U.S. 1150, 103 S.Ct. 796, 74 L.Ed.2d 1000 (1983), *overruled on other grounds*, *Wimberly v. Labor & Industrial Relations Commission*, 479 U.S. 511, 107 S.Ct. 821, 93 L.Ed.2d 909 (1987), it later amended its judgment and ordered the Commission to pay Austin retroactive benefits. The district court's ruling on these issues is now before us on appeal.

We do not agree that the statute is facially unconstitutional. In our view, the statute's denial of benefits to employees who resign to follow their spouses does not so fundamentally affect marriage relationships that it must be examined under heightened judicial scrutiny. Gauging the statute under the rational-basis test, we conclude that a reasonable and rational connection exists between the legislation and the legitimate purpose motivating its enactment. Therefore, we reverse that portion of the district court's judgment enjoining the enforcement of the statute. We agree with the district court, however, that the Virginia statute as applied to Austin violates her first amendment right to the free exercise of religion. We think that *Brown* does not control the outcome of this issue and that the eleventh amendment prohibits the award of retroactive benefits. Therefore, we reverse that part of the district court's judgment awarding those benefits.

I

Austin was employed by McVitty House, Inc., in Salem, Virginia, from May 14, 1984 through June 3, 1985. In the spring of 1985, her husband decided to move approximately 150 miles away to Castlewood, Virginia, to care for his 81-year-old mother who lived there. Austin quit her job with McVitty House to accompany her husband to Castlewood and, unable to find employment, she applied for state unemployment benefits on July 2, 1985. At the time of her benefits application, Virginia Code § 60.1–58(a)[2] provided that an employee was disqualified from receiving unemployment benefits if he or she "left work voluntarily without good cause." Interpreting "good cause" in section 60.1–58(a), the Commission had established a practice of granting unemployment compensation to employees who left work voluntarily for

1. Virginia Code § 60.1–58(a) provided that ordinarily an employee who voluntarily quits work is ineligible for unemployment benefits unless "good cause" is established. Germane to this case, however, the statute further provided that quitting work in order to follow a spouse can never be considered "good cause."

2. Section 60.1–58(a) was repealed and recodified in section 60.2–618(1), effective January 1, 1987.

purely personal reasons of a compelling nature. In 1979, however, the Virginia legislature amended section 60.1–58(a) to provide that "the voluntary leaving of work with an employer to accompany or to join his or her spouse in a new locality" is *not* "good cause."

When Austin filed her claim for unemployment benefits, a deputy of the Commission determined that she was ineligible for benefits because she voluntarily left her employment without good cause. Austin appealed that denial within the Commission, and, on August 22, 1985, an appeals examiner conducted a hearing. Austin testified that her husband moved from Salem to Castlewood to care for his elderly mother. She testified that she and her husband are members of the Holiness church, that her husband had been a member of the religion since he was an infant, and that she joined the church when she married him eighteen years prior to the time of her resignation from the McVitty House employment. She explained the tenets of her faith during the hearing:

> [W]e, uh, abide by what the Bible tells us and we live what is wrote in God's Word, His Bible.
>
> . . . .
>
> . . . [O]ur belief is that we honor our husband. It tells you in the Bible that you honor your husband and his decisions on things. And, uh, [we] feel like that if you go against a decision like this pertaining to his mother, which it says in the Commandments that you honor your father and your mother. And in this case his mother needed him and he felt like that he would be going against what the, that our religion is, that he would be going against God's Word if he did not go and, and take care of his mother when she was in need. And therefore [we] also believe[ ] that you honor your husband's decision and that you go where your husband says go, because [we] feel like that that's breaking up a home . . . if you don't.
>
> . . . .
>
> It is been taught to us and in the Bible it, it tells you [that the Commandment,

"Honor thy father and thy mother," applies to one's in-laws]. It's not that, uh, it's, it's his mother and, and it, and, respect it is my mother too in our belief. It is, um . . . She's just like, it would be my own mother in our belief because she's part of our family. It's her, it's his mother, but just like, um, my mother and father, we do and, and honor what they think. . . . And what they need.

> . . . .
>
> . . . I . . . didn't feel like there was any other choice to be made. . . . [B]ecause of our religion I felt . . . it was the right thing to do because his mother needed help and she's part of the family and we abide by our religion that part of the fam[ily]. You take care. . . .

The appeals examiner nevertheless decided that she was not entitled to unemployment benefits, and she appealed to the Commission itself.

On March 5, 1986, the Commission issued an opinion affirming the decision of the appeals examiner. It held that Austin's primary reason for quitting her job was a desire to move with her husband to a new locality and that she therefore voluntarily left her employment without good cause. The Commission also rejected Austin's first amendment free exercise claim:

> [Austin's] decision to terminate employment was not because of any religious objection to the job held or work requirements expected of her. [She] was, at all times, consistent with her claimed religious belief, able to be employed but for the decision of her husband to relocate. In this case, [her] decision to quit her employment had nothing to do with any religious objection to the job itself or to a requirement of the employer.

Austin then filed suit in district court challenging the constitutionality of section 60.-1–58(a) based on, *inter alia*, the first amendment free exercise clause and the fourteenth amendment due process clause.

## II

■ In our view, the district court correctly analyzed United States Supreme Court precedent as requiring its finding

that the Commission violated Austin's first amendment free exercise rights. In *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the Supreme Court held that a South Carolina statute abridged the appellant's first amendment right to free exercise of religion by disqualifying her from receipt of unemployment compensation benefits because of her refusal to work on Saturday. She was a member of the Seventh–Day Adventist church whose tenets prohibited Saturday labor. The Court stated:

> The [denial] forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.
>
> . . . .
>
> . . . [T]o condition the availability of benefits upon this appellant's willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties.

*Id.* at 404, 406, 83 S.Ct. at 1794, 1795. The Court went on to hold, of course, that only a compelling state interest could justify such a burden on first amendment rights. Responding to an argument that South Carolina had a compelling interest to prevent the possibility of fraudulent claims, the Court explained that "even if the possibility of spurious claims did threaten to dilute the fund and disrupt the scheduling of work, it would plainly be incumbent upon the appellees to demonstrate that no alternative forms of regulation would combat such abuses without infringing First Amendment rights." *Id.* at 407, 83 S.Ct. at 1795.

In *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), a Jehovah's Witness was transferred from a roll foundry of a fabricated sheet steel factory to a department that fabricated turrets for military tanks. He quit his position because all jobs available to him involved weapons production and because his religious beliefs prevented him from working on weapons. His subsequent request for unemployment benefits was denied. The Supreme Court concluded that Thomas clearly terminated his employment for religious reasons. The Court stated that "[t]he narrow function of a reviewing court . . . is to determine whether there was an appropriate finding that petitioner terminated his work because of an honest conviction that such work was forbidden by his religion." *Id.* at 716, 101 S.Ct. 1431. The Court, following *Sherbert,* explained that the denial of benefits placed a burden on Thomas' religious liberty:

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

*Id.* at 717–18, 101 S.Ct. at 1431–32. It stated that the state can justify such an "inroad on religious liberty" only by showing it has used "the least restrictive means of achieving some compelling state interest." *Id.* at 718, 101 S.Ct. at 1432. Under this strict scrutiny, the Court concluded that the state interest of preventing a burden on the unemployment fund did not justify the denial of benefits.

Recently, the Supreme Court again entertained this basic first amendment issue in *Hobbie v. Unemployment Appeals Commission of Florida*, 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987). During her employment with a jewelry store, Hobbie converted to the Seventh–Day Adventist religion. Following her new religious beliefs, she refused to work on Friday evenings and Saturdays. She was therefore discharged and subsequently denied state unemployment benefits. The Court quoted *Sherbert* and *Thomas* and found that the denial of benefits to Hobbie violated her first amendment free exercise right. The

Court explained that "[i]n *Sherbert, Thomas,* and the present case, the employee was forced to choose between fidelity to religious belief and continued employment; the forfeiture of unemployment benefits for choosing the former over the latter brings unlawful coercion to bear on the employee's choice." 107 S.Ct. at 1051. That Hobbie's beliefs changed during the course of her employment was constitutionally irrelevant because "[t]he First Amendment protects the free exercise rights of employees who adopt religious beliefs or convert from one faith to another after they are hired." *Id.*

Here, Austin has unquestionably established that she terminated her employment with McVitty House because of her sincere religious beliefs. She testified that her Holiness faith required her to abide by her husband's decision to move to Castlewood and to stay with her family. Neither the examiner during the hearing nor the Commission on administrative appeal questioned the sincerity of Austin's beliefs. We agree with the district court that no meaningful distinction exists between these circumstances and those that the Supreme Court reviewed in *Sherbert, Thomas,* and *Hobbie.* Guided by the rationale announced in those cases, we find that the Commission cannot show a compelling justification for penalizing Austin for adhering to her religious beliefs. The Commission argues that the Commission must maintain the fiscal integrity of the unemployment compensation fund and ensure stability of employment. The Supreme Court rejected similar proffered justifications in *Sherbert* and *Thomas.* In our view, any decision different from the one we reach today would require a narrowing of the broad doctrine announced in the governing trilogy of cases.

### III

■ The district court, citing *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) and *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion), held that section 60.1–58(a) of the Vir-

ginia Code impinges impermissibly upon the fundamental constitutional right of a married couple to live together. In *Zablocki,* the Supreme Court examined a Wisconsin statute providing that any resident having minor children not in his custody, which he was under an obligation to support by court order, could not marry without obtaining court approval. The plaintiff and the woman he wanted to marry were expecting a child and wanted to marry before the child's birth, but they were denied a marriage license because the plaintiff did not have court approval. The Court stated:

> It is not surprising that the decision to marry has been placed on the same level of importance as decisions relating to procreation, childbirth, child rearing, and family relationships.... [I]t would make little sense to recognize a right of privacy with respect to other matters of family life and not with respect to the decision to enter the relationship that is the foundation of the family in our society.

434 U.S. at 386, 98 S.Ct. at 681. Because the statutory classification "directly and substantially" interfered with the fundamental right to marry, *id.* at 387, 98 S.Ct. at 681, the Court held that the classification violated equal protection when reviewed under the required heightened judicial scrutiny.

In *Moore,* the Court considered the constitutionality of a housing ordinance that limited occupancy of a residence to a single narrowly-defined family. A grandmother who housed two grandsons was prosecuted for violation of the ordinance and convicted. The *Moore* plurality, in reversing her conviction, decided that the rights of persons to live together as a family is one of the liberties protected by the due process clause of the fourteenth amendment. 431 U.S. at 499–500, 97 S.Ct. at 1935–36.

We do not think, however, that the circumstances bearing on marriage and family unity that we consider here equate to the circumstances present in *Zablocki* and *Moore.* There are, of course, many state regulations affecting the marriage relationship that do not implicate constitutional

concerns. In our view, the regulation of unemployment compensation benefits to married persons in the context presented here is one of them.

The Supreme Court, in *Lyng v. Castillo*, 477 U.S. 635, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986), examined the constitutionality of the narrow definition of "household" in the Food Stamp Act. The Act treats parents, siblings, and children who live together as a single "household"; however, distant relatives and unrelated persons who live together are not a "household" unless they purchase food and prepare meals together. The Court held that this classification does not " 'directly and substantially' interfere with family living arrangements and thereby burden a fundamental right." *Id.* at 638, 106 S.Ct. at 2729–30. The Court explained:

> The "household" definition does not order or prevent any group of persons from dining together. Indeed, in the overwhelming majority of cases it probably has no effect at all. It is exceedingly unlikely that close relatives would choose to live apart simply to increase their allotment of food stamps, for the cost of separate housing would almost certainly exceed the incremental value of the additional stamps.

*Id.* Upholding the constitutionality of the Act, the Court applied a rational-basis test because the "household" definition does not burden a fundamental right. *Id.* at 639, 106 S.Ct. at 2730.

Two years later, in *Lyng v. International Union, UAW,* —— U.S. ——, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988), the Supreme Court also held constitutional a 1981 amendment to the Food Stamp Act which prohibits a household from becoming eligible for, or increasing benefits of, food stamps when a member of the household is on strike. Following *Castillo,* the Court held that a rational-basis review was appropriate rather than a stricter standard because the 1981 amendment does not significantly implicate a fundamental right:

> As was true of the provision at issue in *Castillo,* it is "exceedingly unlikely" that [the 1981 amendment] will "prevent any group of persons from dining together." Even if isolated instances can be found in which a striking individual may have left the other members of the household in order to increase their allotment of food stamps, "in the overwhelming majority of cases [the statute] probably has no effect at all." The statute certainly does not "order" any individuals not to dine together; nor does it in any other way " 'directly and substantially' interfere with family living arrangements."

*Id.* at 1189 (quoting *Castillo,* 477 U.S. at 638, 106 S.Ct. at 2729–30) (citations omitted (second brackets in original)).

We find that rational-basis review is appropriate to determine the facial validity of section 60.1–58(a). Following the analysis of *Castillo* and *International Union,* we conclude that the Virginia statute does not "directly and substantially" interfere with the fundamental right to marry or the fundamental right to live together as a family. Section 60.1–58(a), which makes ineligible for unemployment compensation an employee who quits work to follow his or her spouse to a new place of residence, does not "order or prevent" spouses or families from living together. It is "exceedingly unlikely" that a spouse would decide to remain at work and not to follow his or her spouse simply because the spouse would be ineligible to receive unemployment benefits. Even if rare cases exist in which workers decide not to accompany their spouses to a new place of residence simply because they know they will be ineligible for benefits, section 60.1–58(a) " 'in the overwhelming majority of cases ... probably has no effect at all,' " *International Union,* 108 S.Ct. at 1189 (quoting *Castillo,* 477 U.S. at 638, 106 S.Ct. at 2729–30). Therefore, we hold that the Virginia statute does not significantly burden a fundamental right. Under the proper standard of review, we think that the Virginia legislature had a rational basis to protect the unemployment compensation fund from what it determined are unmerited claims.

## IV

■ The district court, in its published opinion, awarded declaratory and injunctive

relief in favor of Austin on her "free exercise" claim. The court recognized the forceful effect of *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), in which the Supreme Court held that the eleventh amendment prohibits an award of retroactive monetary damages against a state treasury. Holding itself bound to do so by our decision in *Brown v. Porcher,* 660 F.2d 1001 (4th Cir.1981), *cert. denied,* 459 U.S. 1150, 103 S.Ct. 796, 74 L.Ed.2d 1000 (1983), *overruled on other grounds, Wimberly v. Labor & Industrial Relations Commission,* 479 U.S. 511, 107 S.Ct. 821, 93 L.Ed.2d 909 (1987), however, the district court amended its judgment after the publication of its opinion and ordered an award of retroactive benefits from Virginia's unemployment compensation fund.

In *Brown,* we held that a retroactive award against the "insulated, separately financed" South Carolina unemployment compensation fund does not violate the eleventh amendment. *Id.* at 1007. As the district court recognized in its amended judgment, however, crucial distinctions exist between Virginia's unemployment compensation fund and the South Carolina fund that we considered in *Brown.* Crucial to our decision in *Brown* was our understanding that the South Carolina fund is administered separately from all other public funds. As required by article 10, section 7 of the Virginia Constitution and Virginia Code §§ 60.2–301 and 60.2–302 (1987), all contributions are paid into the state treasury and then credited to the fund. Moreover, under section 60.2–304, the State Treasurer makes all payments and disbursements from the fund at the request of the Comptroller. The fund is also subject to Virginia's general budgetary process under section 2.1–394.

Although the district court ordered the four appellants to pay Austin retroactive benefits, a retroactive benefits payment check, if made, would be at the request of the Comptroller and signed by the State Treasurer. Such a payment "is in practical effect indistinquishable in many aspects from an award of damages against the State." *Edelman,* 415 U.S. at 668, 94 S.Ct.

at 1358. In our view, the Virginia Constitution and the Virginia Code categorize the entire structure of the Virginia unemployment compensation fund as a part of the integrated Virginia treasury. We hold, therefore, that the eleventh amendment forecloses an award of retroactive monetary relief to Austin and limits her recovery to declaratory and injunctive relief.

V

In view of the above, the judgment of the district court is affirmed in part, reversed in part, and remanded for proceedings consistent with the views expressed in this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

MURNAGHAN, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority view that the statute as applied does not facially violate the fourteenth amendment; in my opinion it also does not violate Austin's first amendment rights to the free exercise of her religion, and I dissent from the portion of the majority opinion which reaches a contrary conclusion.

Admittedly, *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), *Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), and *Hobbie v. Unemployment Appeals Commission of Florida,* 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987), which the majority relies upon, all arose in the context of employer-employee disparate views of the proper consequences of termination or discharge for religiously related reasons and each held unconstitutional the denial of unemployment benefits based on religiously motivated conduct. They do not, however, mandate a similar result in the instant case.

Sherbert was a Seventh Day Adventist who declined to work on Saturday. There was no showing that all possible attempts at accommodation had been made by the

employer, and it is clear that Sherbert remained geographically able and physically and mentally available, ready and willing to work, except on Saturday. *Sherbert*, 374 U.S. at 399 and nn. 1 & 2, 83 S.Ct. at 1791 and nn. 1 & 2. She could, through schedule rearrangement, put in a complete work week. The reason for discharge by the employer, Sherbert's refusal on religious grounds to labor on Saturday, whether it was justified or not, originated with the employer.

By contrast Austin had unilaterally removed herself 150 miles to a place where her employer maintained no plant and where, geographically and physically, she was altogether unable to show up for employment. The employer would have welcomed her return and erected no obstacles whatever to her return.

In *Thomas*, we met a Jehovah's Witness who remained geographically available, and physically and mentally ready to work so long as he did not have to fabricate military arms. *Thomas*, 450 U.S. at 710–11, 101 S.Ct. at 1428. The employer started it all by insisting on production of military equipment, forcing Thomas to quit.

*Hobbie* dealt with unemployment resulting from a firing by the employer similar to that in *Sherbert* on the facts but also significantly different in the condition under which the employees qualified for benefits. The employees qualified on becoming unemployed through no fault of their own. *Hobbie*, 480 U.S. at 138, 107 S.Ct. at 1047–48. Hobbie had performed no acts constituting a fault and therefore precisely met the statutory qualifying language. Austin would not so qualify, since she manifestly had totally left her employment to accompany her spouse, a specific disqualification under the Virginia statute.

Indeed, on probing beneath the surface, one must wonder if a statute providing for unemployment compensation benefits has any application here. The employer never fired Austin nor did anything to interrupt her employment. So far as the record gives any indication, it would have welcomed her back to her workplace. If the husband's move had been of lesser geographical extent than the 150 mile distance which loomed up to frustrate a daily two-way commute to work of twice that magnitude, Austin would still have been able to make the journey from home to work, regardless of the spouse's relocation, and without any steps by the employer interfering with her employment.

In short, *Sherbert, Thomas* and *Hobbie* each involved a choice forced on an employee between a religious conviction, on the one hand, as against an employer demand amounting to a condition of employment, on the other. The employee remained in each case, except for the condition imposed by the employer, able to show up regularly at the place of employment ready to work. In Austin's case, to the extent there really was *any* opportunity to select an alternative, the choice was between religious conviction and yielding to human physical limits not imposed by the employer but uniformly applicable by nature to us all.

Stated otherwise, geography not religion was the exclusive cause (akin to the common law concept of proximate cause), since the choice of a new residence by Austin's spouse led inexorably to her unemployment solely for reasons of distance. A selection of residence by the spouse within commuting distance of the workplace would have occasioned no comment or objection by the employer.

Unemployment, as used in the Virginia statute, contemplates an employer and an employee with the actions of the former originating the state of unemployment. Employment may embrace self-employment for some purposes. *Moore v. Harris*, 623 F.2d 908 (4th Cir.1980). But *un*employment does not equate to self-unemployment under the Virginia statute, which evidently does not extend benefits to formerly self-employed individuals. *E.g.*, Va.Code § 60.2–612(1) (benefits depend on wages earned from working for employers).

Here it was the altogether individual, one-sided religiously inspired action of Austin in deciding to move and actually in moving 150 miles away. For that step, she "worked" for herself, not for McVitty House, Inc., her putative employer. So far

as the State of Virginia was concerned it was that individually inspired and accomplished action with which it was concerned, not any step of the employer.

As *Sherbert* acknowledged, there is no "constitutional right to unemployment benefits on the part of all persons whose religious convictions are the cause of their unemployment." *Sherbert*, 374 U.S. at 409–10, 83 S.Ct. at 1796–97. Thus, determining whether it is unconstitutional to deprive Austin of benefits under the Virginia statute necessarily involves not simply drawing broad conclusions from sweeping judicial language wrenched from its factual predicate, but rather engaging in a detailed examination of the applicable precedent and statutes.[1]

### I.

In *Sherbert v. Verner*, South Carolina denied unemployment benefits to Sherbert, a Seventh Day Adventist, who had been discharged by her employer because she would not work on Saturday. South Carolina law provided that a claimant is ineligible for benefits "[i]f ... he has failed, without good cause ... to accept available suitable work when offered him by the employment office or the employer." S.C. Code, Title 68, § 68–114. The South Carolina Employment Security Commission found Sherbert's employer, though insisting on Saturday work, nevertheless brought her within the provision, rendering her ineligible for benefits. The employer in Austin's case, to the contrary, had not moved to discharge Austin but rather continued to make available—in effect offered—suitable work.

The Court found the disqualification constitutionally burdensome in *Sherbert*. Sherbert's ineligibility derived "solely from the practice of her religion", resulting in pressure to:

> choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion to accept work on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.

*Sherbert*, 374 U.S. at 404, 83 S.Ct. at 1794.

The Court also found it significant that South Carolina specifically permitted Sunday worshippers an exemption from working in textile plants authorized to work on Sunday. *Sherbert*, 374 U.S. at 406, 83 S.Ct. at 1795. The constitutional burden, for which there was no equivalent in Austin's case, posed by Sherbert's disqualification was "compounded" by the statutory scheme's religious discrimination. *Id.*

---

1. It is paramountly important to recognize that following wherever her spouse led, while a religious reason, really was not the cause of Austin's unemployment, and certainly was not employer instigated or originated. If her husband had moved next door, or down the street, or even one mile, five miles or ten miles away, Austin would have been perfectly able to accompany him and still turn up each day in time for work. The employer would have raised no obstacles, and, so far as the record discloses, would have welcomed her. A distance of forty miles might have been manageable. People commute daily between Baltimore and Washington and such travel distance is commonplace for persons employed in New York City who reside in Mamaroneck, Rye or Scarsdale, not to mention numerous Connecticut towns such as Greenwich. Whatever the distance between home and job, Austin remained welcome to come to work for the employer. Even 150 miles would have been perfectly agreeable to the employer if she could have handled the distance, and it was only her finding that it was practically impossible to negotiate 150 miles twice each day which gave rise to the problem we face. That factor related only to geography, not in any substantial sense to religion.

If the statute in spelling out disqualification had read "voluntarily leaving work to establish residence in a new locality situated more than 125 miles distant from the workplace," the statute's validity, not even mentioning marriage or a spouse, would hardly turn on whether the move had, incidentally, been due to a religious command to follow the decamping spouse.

Suppose a Carmelite nunnery was established within one mile of Austin's workplace and she chose to enter as a novitiate with the consequence that she became cloistered, and hence "unemployed." Her religion would then be the "cause" of unemployment, but the employer in no way caused a choice between work and religion to arise. It would welcome Austin with open arms. Yet her unavailability for work would serve to preclude unemployment compensation benefits. *See* Va.Code § 60.2–612(7).

In the absence of a compelling state interest such a burden was unconstitutional. Such a ruling, the Court maintained, did not "establish a religion":

> [T]he extension of unemployment benefits to Sabbatarians in common with Sunday worshippers reflects nothing more than the governmental obligation of neutrality in the face of religious differences, and does not represent that involvement of religious with secular institutions which it is the object of the Establishment Clause to forestall.

*Sherbert*, 374 U.S. at 409, 83 S.Ct. at 1796–97.

In *Thomas v. Review Board*, Thomas, a Jehovah's Witness, was initially hired to work in a roll foundry which fabricated sheet steel. When the factory closed, he was transferred to a department that fabricated turrets for military tanks. Thomas' religious beliefs prevented him from participating in the manufacture of arms. Since all of the employer's remaining departments were engaged in the production of weaponry, Thomas asked to be laid off. When the request was disapproved, he quit, subsequently filing a claim for unemployment benefits.

Indiana's unemployment compensation statute provided limited benefits to an individual "who has voluntarily left his employment without good cause in connection with the work." Ind.Code § 22–4–1–1 *et seq.* A hearing was conducted, wherein a referee found that, although Thomas had quit because of his religious beliefs, his termination was not based upon "good cause." Consequently, Thomas' claim was disapproved. *Thomas*, 450 U.S. at 711–12, 101 S.Ct. at 1428–29.

The Supreme Court found Indiana's denial of benefits to Thomas unconstitutional.

A good cause, in such circumstances, could have been found, bearing in mind the religious motivation, which should presumably qualify as "good," and the fact that the employer not the employee initiated the steps leading to the quitting of someone geographically and physically ready, willing and able to work. In that manner, only a question of statutory construction rather than a constitutional issue would have been posed.

"A person," the Court stated, "may not be compelled to choose between a first amendment right and participation in an otherwise available public program." *Thomas*, 450 U.S. at 716, 101 S.Ct. at 1431.[2] Thus, a state may not

> "exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, because of their faith, or lack of it, from receiving the benefits of public welfare legislation." *Everson v. Board of Education*, 330 U.S. 1, 16, 67 S.Ct. 504, 511–12, 91 L.Ed. 711 (1947) (emphasis deleted).

*Thomas*, 450 U.S. at 716, 101 S.Ct. at 1431. The Court found that because, just as South Carolina in *Sherbert*, Indiana was forcing Thomas to choose between his religious precepts and forfeiting benefits, an impermissible constitutional burden arose in the absence of a state showing that it is "the least restrictive means of achieving some compelling state interest." *Thomas*, 450 U.S. at 718, 101 S.Ct. 1432.[3] The interests urged by Indiana, the avoidance of a wholesale defection from the job market if individuals could voluntarily terminate their employment for personal reasons, and the avoidance of detailed probing by employers into employees' religious beliefs, were found wanting by the Court. *Id.* at

**2.** There was no such choice imposed on Austin. She, on her own, left a job that remained completely open to her and did not create in any way a religious conflict.

**3.** By contrast, Austin's employer requires no choice. Her employer would allow her freely to exercise her choice as to where she would live and raised no difficulty about the distance between work and home. If she showed up on time that would be fine with the employer and

it was solely Austin's decision not to do so which unilaterally led to the termination of her employment. If the employer had sought to restrict Austin's travel, we would at least have to address the question of whether a fourteenth amendment concern may have emerged. *Accord, Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974).

718–19, 101 S.Ct. at 1432–33. Accordingly, it held the denial of benefits to Thomas unconstitutional.[4]

The Supreme Court again considered this issue in *Hobbie v. Unemployment Appeals Commission of Florida*. After working for a Florida company for two and one-half years, Hobbie informed her employer she had converted to Seventh Day Adventism and could no longer work on Friday evening or Saturday. Her immediate supervisor initially made arrangements to accommodate Hobbie's new schedule, but she was eventually discharged by the company's general manager. Hobbie subsequently filed a claim for unemployment benefits. *Hobbie*, 480 U.S. at 138, 107 S.Ct. at 1047–48.

Florida provided unemployment compensation benefits to persons who become "unemployed through no fault of their own." Fla.Stat. § 443.021 (1985). A claims examiner found Hobbie was "disqualified"; because of her refusal to work scheduled shifts, she had been discharged for "misconduct connected with [her] work." § 443.101(1)(a).[5] Citing *Sherbert* and *Thomas*, the Supreme Court found the disqualification unconstitutional.[6] *Hobbie*, 480 U.S. at 139–44, 107 S.Ct. at 1048–51.

The fact Hobbie was the "agent of change" was irrelevant. *Id.* at 143, 107 S.Ct. at 1050. The guiding principle was the same.

> In *Sherbert, Thomas*, and the present case, the employee was forced to choose between fidelity to religious belief and continued employment; the forfeiture of unemployment benefits for choosing the former over the latter brings unlawful coercion to bear on the employee's choice.

*Hobbie*, 480 U.S. at 144, 107 S.Ct. at 1051.

The Court also once more rejected an Establishment Clause challenge, recognizing that government may accommodate religious practices without violating the Establishment Clause. *Hobbie*, 480 U.S. at 144–45, 107 S.Ct. at 1051–52.[7] Once again, the Court cited the above quoted language from *Sherbert*, maintaining the "governmental obligation of neutrality in the face of religious differences." *Hobbie*, 480 U.S. at 145, 107 S.Ct. at 1051 (quoting *Sherbert*, 374 U.S. at 409, 83 S.Ct. at 1796–97).[8] The Court noted that its recent decision in *Estate of Thornton v. Caldor*, 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985) did not affect Hobbie's claim:

> In *Thornton*, we held that a Connecticut statute that provided employees with an

---

4. *Thomas* acknowledged the "tension" between the free exercise and the Establishment Clause of the first amendment, but resolved any establishment problems by quoting its relevant language from *Sherbert* cited above. *Thomas*, 450 U.S. at 719–20, 101 S.Ct. at 1432–33.

   We here are presented, however, with another, quite different least restrictive means of achieving some compelling state interest where the state and indirectly the employer should not be required to suffer an economic detriment in the form of payment of the substantial equivalent to wages to an employee who quit and put herself in a position, for whatever reason, where the employer could not under any reasonable circumstances economically benefit from her actions and, at all times, remained completely willing to accept her as an employee.

5. Florida defined misconduct as:

   'Misconduct' includes, but is not limited to, the following, which shall not be construed in pari materia with each other:

   (a) Conduct evincing such willful or wanton disregard of an employer's interests as is found in deliberate violation or disregard of standards of behavior which the employer has the right to expect of his employee; or

(b) Carelessness or negligence of such a degree or recurrence as to manifest culpability, wrongful intent, or evil design or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer.

Fla.Stat. § 443.036(24) (1985).

6. The Court might have recognized that when religious principles force one to leave one's job one becomes unemployed through no *fault* of his or her own.

7. Here, however, the point is that accommodation was not a question in Austin's case unless "accommodation" is to take on an entirely new meaning of "doing whatever to give benefit to the religious practitioner is needed, regardless of what dislocations of business result and the continued undisturbed availability of the job" and however impractical, for geographical reasons, not religious ones, any solution would be.

8. Such a perversion of the meaning of "accommodation" in Austin's case would not result in neutrality.

absolute right not to work on their Sabbath violated the Establishment Clause. The Court determined that the State's "unyielding weighting in favor of Sabbath observers over all other interests ... ha[d] a primary effect that impermissibly advance[d] a particular religious practice," *id.*, at 710, 105 S.Ct. at 2918, and placed an unacceptable burden on employers and co-workers because it provided no exceptions for special circumstances regardless of the hardship resulting from the mandatory accommodation.

In contrast, Florida's provision of unemployment benefits to religious observers does not single out a particular class of such persons for favorable treatment and thereby have the effect of implicitly endorsing a particular religious belief. Rather, the provision of unemployment benefits generally available within the State to religious observers who must leave their employment due to an irreconcilable conflict between the demands of work and conscience neutrally accommodates religious beliefs and practices, without endorsement.

*Hobbie*, 480 U.S. at 145–46, 107 S.Ct. at 1051–52.

## II.

*Austin* presents a different case. Austin, without prior notice, quit her job in Salem, Virginia, to move with her spouse to Castlewood, Virginia, a location 150 miles away. Austin then applied for unemployment benefits. Virginia Code § 60.1–58(a)[9] provided an individual is disqualified for benefits if such individual

is unemployed because he left work voluntarily without good cause. As used in this chapter "good cause" shall not include ...

(ii) voluntarily leaving work with an employer to accompany or to join his or her spouse in a new locality.

Austin claimed her religious beliefs required her to follow her husband. In accordance with the above unambiguous and generally applicable and neutral provision,

the Virginia Employment Commission denied her unemployment benefits.

There are several substantial differences between Austin and the trilogy of *Sherbert, Thomas* and *Hobbie.* Initially, Austin, unlike the others, involved no conflict between circumstances of work and religious precepts. Austin had no religious objection to her employer nor it to her; her sole grounds for applying for benefits was her unilateral decision to relocate a distance of 150 miles, precluding *her* commuting to work which was waiting for her. There is no practical possibility of an accommodation on the part of her employer. It would have to rearrange and dislocate its business by opening a branch office in Castlewood, Virginia, 150 miles away. In *Sherbert* and *Hobbie*, the employer could have accommodated the employee's schedule needs; in *Thomas* the employer decided to close its only non-war-related production facility. The employer in each case was the actor, not, as with Austin, the employee. The distinction is vital; Virginia's unemployment compensation scheme, Va. Code § 60.2–100 *et seq.*, is primarily intended to provide temporary financial assistance to workers who have become unemployed through no fault of their own, *Ford Motor Co. v. Unemployment Comp. Comm.*, 191 Va. 812, 824, 63 S.E.2d 28, 33–34 (1951). An employer's contributions to the unemployment compensation fund are "increased proportionately with the valid compensable unemployment of its employees." *Ford*, 191 Va. at 816, 63 S.E.2d at 30; Va.Code §§ 60.2–525 –538. In essence, the practical significance of *Sherbert, et al.*, is to offer an employer a choice—either accommodate its employees' religious views or find other work for them in the vicinity. Failure to do either will result in unemployment benefits for consequential unemployment. Here, the scenario is different. Austin's employer is offered *no* choice. I cannot subscribe to the holding that it must compensate her for her *unilateral* decision to relocate to a location beyond commuting distance while

**9.** Now codified at Va.Code § 60.2–618 (1987).

in no way acting to make the job unavailable to her.

Furthermore, the decision to deny benefits to Austin is not a discriminatory one. Here, there is no amorphous standard of "good cause", as in *Sherbert* and *Thomas,* or "misconduct" as in *Hobbie,* which can be construed under agency discretion to the detriment of Austin's religious beliefs. Virginia has *specifically prohibited,* in unambiguous statutory language, the payment of unemployment benefits to those individuals whose only "good cause" for voluntarily leaving employment is the desire to join their spouses in a new locality, in the present case beyond commuting distance. No matter how just or appealing the reason, one whose religion does not specifically command spousal obedience cannot claim unemployment benefits if he or she voluntarily leaves his or her post to join his or her spouse. Virginia meets *Sherbert*'s "obligation of neutrality", 374 U.S. at 409, 83 S.Ct. at 1796–97, by abiding by the statutory command, not by solely exempting only a certain class of religious practitioners. Austin has not been denied a public welfare benefit available to others because of her religion, *see Thomas,* 450 U.S. at 716, 101 S.Ct. at 1431; the majority requires Virginia to *create* a benefit, and extend it only to those of Austin's similar religious beliefs. "Extend" and "establish" differ little in meaning in the circumstances.

Creating by judicial amendment such a mandatory "accommodation" raises, in a manner sufficiently dissimilar from the ones in the free exercise "trilogy," the spectre of the Establishment Clause. As *Hobbie* observed, *Thornton* holds that a statutory clause resulting in an "unyielding weighting" in favor of one branch of religious observers over other interests has a primary effect that advances a particular religious practice. *See Hobbie,* 480 U.S. at 145–46 n. 11, 107 S.Ct. at 1051–52 n. 11; *Thornton,* 472 U.S. at 710, 105 S.Ct. at 2918. The trilogy involves general clauses that could permit innumerable permutations of religious practices. Here, the majority would specifically exempt from the statute's clear command only one class of

religious observers—those individuals whose religion requires them absolutely to obey their spouses' commands as to where they shall reside.

Moreover, *Thornton* indicates that heightened constitutional scrutiny is required because of the difficulty involved in measuring legislation mandating private accommodation to religious practices. Virginia unemployment benefits are paid out of a compensation fund supplied, in substantial measure, by taxes levied on employers. Individual employers are taxed at a rate relative to the number of benefit charges claimed by their former employees. Va.Code §§ 60.2–525–538. Thus, it is in some measure the employers, not just the state, that must subsidize the payment to Austin in this instance. Certain circumstances are within the employer's purview—work schedules, closings, etc. Others are not. *See, e.g., Employment Division, Dept. of Human Resources of the State of Oregon v. Smith,* —— U.S. ——, 108 S.Ct. 1444, 99 L.Ed.2d 753 (1988) (no constitutional requirement to "accommodate" illegal behavior on the part of an employee, even if religiously motivated). The hardship imposed by such an exemption further militates against finding a constitutionally required exemption. Here the employer still stands ready to accept Austin as an employee if only she shows up for work.

In conclusion, the Virginia unemployment statute does not constitute an impermissible burden on Austin's constitutional right to the free exercise of her religion. The statute is nondiscriminatory in both language and application. Austin is not being forced to choose between fidelity to religious belief and "an otherwise available public program." *Thomas,* 450 U.S. at 716, 101 S.Ct. at 1431. She can follow her spouse wherever his fancy leads and if she shows up for work she will be employed. She is asking us judicially to create an unemployment benefit available only to those of her religious philosophy, and moreover a benefit that for all practical purposes constitutes a mandatory fiscal benefit or windfall, not an "accommoda-

tion," extracted from her private employer. This "unyielding weighting" in favor of one class of religious observers, *Thornton*, 472 U.S. at 710, 105 S.Ct. at 2918, would "impermissibly advance a particular religious practice," *id.*, a result that would be unconstitutional under the first amendment. I, accordingly, dissent from the holding that there has been a first amendment violation.

Even had my conclusion coincided with that of my panel colleagues, I am suspicious that the issue which divides us does not merit the attention it has received by both majority and dissent since the majority acknowledges that Austin, in view of the Eleventh Amendment bar, can collect nothing. Pecuniary consequences rather than an abstract desire for "declaratory and injunctive relief" may have motivated the not-inexpensive legal battle which has been waged.

Indeed, the state authorities, perhaps unnecessarily, made trouble for all concerned by conceding the genuineness of Austin's religious motivation and its causative force. Their doing so is understandable since the statute, Va.Code § 60.2–618, covered the matter, rendering it apparently altogether unnecessary to question Austin's religious faith, something anyone with an ounce of sensitivity should be loath to do. However, granting the genuineness of the faith does not justify the quantum leap to the conclusion that the existence of the faith led to the unemployment.

Suppose Austin's young son's educational opportunities would be furthered by the 150 mile move, in view of a superior school located that distance away, and the husband chose to go with him to provide living accommodations while the son attended the new school. Would not Austin's move to be with her spouse be a rather attenuated religious reason for entitling her to unemployment compensation benefits? Would it not be Austin's absenting herself an unmanageably large remove so far as commuting was concerned, not employer interference with her religious beliefs, that caused her unemployment (or more precisely "disemployment" since the employer in no way was responsible for it)? Religion, while present, is simply not involved.