CSX TRANSPORTATION, INC.,
et al., Plaintiffs,

v.

THE BOARD OF PUBLIC WORKS OF
THE STATE OF WEST VIRGINIA,
et al., Defendants.

No. Civ.A. 2:96–1905.

United States District Court,
S.D. West Virginia,
Charleston Division.

Feb. 25, 1997.

John R. Fowler, Huddleston, Bolen, Beatty, Porter & Copen, Charleston, WV, Anne M. Stolee, James W. McBride, Baker, Donelson, Bearman & Caldwell, Washington, DC, for Plaintiffs.

Stephanie M. Sisson, Office of Attorney General, Charleston, WV, Katherine A. Schultz, Office of Attorney General, Charleston, WV, Darrell V. McGraw, Jr., Office of Attorney General, Charleston, WV, for Defendants.

*MEMORANDUM OPINION AND ORDER*

HADEN, Chief Judge.

Pending are (1) Defendants' motion for summary judgment which the Court treats as a motion to dismiss pursuant to *Rule 12(b)(1), Federal Rules of Civil Procedure;* and (2) Plaintiffs' motion for a preliminary injunction. The Court **GRANTS** the motion to dismiss and **DENIES** as moot the motion for a preliminary injunction.[1]

## I. FACTUAL BACKGROUND

Plaintiffs CSX Transportation, Inc. ("CSXT") and Nicholas, Fayette & Greenbrier Railroad Company ("NF & G") challenge their West Virginia *ad valorem* tax assessments for the 1996 tax year. They request injunctive and declaratory relief pursuant to Section 306 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 11501 (the "4–R Act").

Plaintiffs allege the West Virginia Board of Public Works ("Board") and its members assessed their property at a ratio of assessed value to true market value more than five percent greater than the ratio of assessed value to true market value at which other commercial and industrial property was assessed for the 1996 tax year in violation of Section 306(1)(a) and (b) of the 4–R Act. The named Defendants are the Board and its individual members, namely the Governor, State Treasurer, State Auditor, Attorney General, Commissioner of Agriculture, and State Superintendent of Schools.[2]

CSXT and NF & G paid the first half of their taxes for the 1996 tax year. The payment of the second half is due on or before March 1, 1997. The Railroads assert "[a]ll of the relief [they] seek in this case can be recovered from that second-half payment." Defs.' mem. in oppos. at 3.

Defendants moved for summary judgment seeking dismissal because of the recent decision of the United States Supreme Court in *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).[3] The Railroads offer three arguments to avoid dismissal. First, they assert *Seminole Tribe* does not operate here because Congress possesses the authority to enact Section 306 pursuant to its powers under section 5 of the Fourteenth Amendment, although it did not choose that route with the enactment of the 4–R Act. Second, they assert this Court has jurisdiction to order prospective injunctive relief against the individual officials of the Board, pursuant to *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Finally, Plaintiffs assert they can cure any alleged jurisdictional defect by adding as Defendants, and proceeding against, the counties where CSXT and NF & G own taxable property.[4]

## II. DISCUSSION

### A. *The 4–R Act and the Fourteenth Amendment:*

In *Harter v. Vernon,* 101 F.3d 334 (4th Cir.1996) the Court of Appeals restated the familiar contours of Eleventh Amendment immunity:

> The Eleventh Amendment provides: '[t]he judicial power of the United States shall not be construed to extend to any suit in

---

1. Plaintiffs requested oral argument on the motions. The facts and legal theories, however, are well-briefed and oral argument would not materially aid the decisional process. Accordingly, the Court **DENIES** Plaintiffs' request.

2. Plaintiffs inadvertently failed to name Secretary of State Ken Hechler, also a member of the Board. The Court makes this correction on its own motion.

3. In a nutshell, *Seminole Tribe* stands for the proposition that Congress lacks authority under the Indian Commerce Clause to abrogate a state's Eleventh Amendment immunity. *Seminole Tribe,* 116 S.Ct. at 1131–32. Perhaps the

more weighty implication of *Seminole Tribe,* however, is its overruling of *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), which held Congress had the power under the Interstate Commerce Clause to abrogate Eleventh Amendment immunity. *Seminole Tribe,* 116 S.Ct. at 1131. Consequently, the only remaining source of abrogation power after *Seminole Tribe* is section 5 of the Fourteenth Amendment. *Id.* 116 S.Ct. at 1125.

4. Plaintiffs do not argue the State has waived its immunity or consented to suit. Plaintiffs also concede the Board is a state entity entitled to the immunity accorded by the Eleventh Amendment protection to the states.

law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State.' Although by its terms the Amendment applies only to suits brought against a state by 'Citizens of another State,' it is well established that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State. This immunity applies to state agencies that may be properly characterized as 'arm[s] of the State[.]'

*Id.* at 337 (citations omitted).

■ Under limited circumstances, however, Congress may abrogate a state's Eleventh Amendment immunity. In *Seminole Tribe,* the Court reiterated the two-part inquiry to determine whether Congress effectively abrogated a state's sovereign immunity from suit in a federal forum:

> [W]e ask two questions: first, whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity,'; and second, whether Congress has acted 'pursuant to a valid exercise of power.'

*Seminole Tribe,* 116 S.Ct. at 1123 (quoted authority omitted). Even assuming Plaintiffs can demonstrate the first prong of the test, Congress could not have abrogated Eleventh Amendment immunity under the Fourteenth Amendment. The very recent decision of *Union Pac. R.R. Co. v. Burton,* 949 F.Supp. 1546 (D.Wyo.1996) makes this and related points tellingly.

In *Burton,* similar to the instant dispute involving West Virginia, plaintiff railroads challenged the 1996 valuation, assessment and equalization of certain property in Wyoming as a violation of section 306. The Wyoming defendants asserted Eleventh Amendment immunity based on *Seminole Tribe.* Like Plaintiffs here, the aggrieved taxpayers in *Burton* argued Congress possessed the authority when enacting the 4–R Act, whether or not it relied on that authority, to abrogate the states' Eleventh Amendment immunity. While the Wyoming Court entertained the suggestion, it ultimately ruled against plaintiffs. Its analysis is worth the lengthy quote:

[U]nder any test the court cannot find Congress could have enacted the 4–R Act pursuant to Section 5 legislation to enforce the Fourteenth Amendment.

As discussed above, the purpose of the 4–R Act, as originally enacted, was to 'provide the means to rehabilitate and maintain the physical facilities, improve the operations and structure, and restore the financial stability of the railway system of the United States.' These are economic objectives designed to further commerce by strengthening the transportation infrastructure of the United States. This was surely an admirable goal and it was well within the power of Congress acting pursuant to the Interstate Commerce Clause to further such objectives. However, such commercial objectives are far afield from the equally admirable objectives of the Fourteenth Amendment.

It is only in relation to one of 'the means chosen by Congress to fulfill these objectives, particularly the goal of furthering railroad financial stability,' that discrimination is mentioned.

As recodified in 1996, the legislative purpose of the 4–R Act is now found at 49 U.S.C. § 10101. That section sets forth, in fifteen numbered paragraphs, the policy of the United States in regulating the railroad industry. Many of these fifteen subsections are themselves divided into yet more clauses setting forth additional objectives. Most of the objectives are commercial and are aimed at furthering commerce by increasing competition and other free market forces. Some of the policies evidence an intent to further both commercial objectives as well as other national objectives. Others, such as subsection (11) ("to encourage fair wages and safe and suitable working conditions"), further commerce by promoting the well-being of its participants. It is only one clause of subsection (12) that discusses discrimination as an objective:

> (12) to prohibit predatory pricing and practices, to avoid undue concentrations of market power, and to prohibit unlawful discrimination.

Viewed as a total, the legislative purpose and predicate cannot be read as evidencing a purpose to enforce rights under the Fourteenth Amendment. This court cannot find that there is any evidence by way of a factual predicate to support a finding that the 4–R Act was enacted to further anti-discriminatory or equal protection claims. Nor can this court regard the legislation as an enactment to enforce the Fourteenth Amendment.

Accordingly, Union Pacific's claim that Congress could have enacted the 4–R Act under the Fourteenth Amendment fails.

*Id.* at 1553–54 (citations and quoted authority omitted).

The Court concurs with the analysis in *Burton.*[5] Accordingly, the Court concludes the attempted abrogation of Eleventh Amendment immunity in the 4–R Act was ineffective because Congress did not legislate pursuant to a valid exercise of power.

### B. The Ex Parte Young Exception and the Individual Board Members' Amenability to Suit:

*Gray v. Laws,* 51 F.3d 426 (4th Cir.1995), discussed the parameters of Eleventh Amendment immunity as such relate to state officials:

Like the state itself, state officers acting in their official capacity are also entitled to Eleventh Amendment protection, because 'a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office,' and '[a]s such, it is no different from a suit against the State itself.'

*Id.* at 431 (quoting *Will v. Michigan Dep't. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (citations omitted)).

■ There is, however, a substantial caveat to this general rule emanating from *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908): "A state and its officers are not entitled to Eleventh Amendment pro-

tection ... where a plaintiff seeks only prospective, injunctive relief." *Id.* 51 F.3d at 430 n. 1; *Edelman v. Jordan,* 415 U.S. 651, 664–68, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). *But see, e.g., Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (recognizing "the [*Ex parte Young* ] exception is narrow: It applies only to prospective relief, [and] does not permit judgments against state officers declaring that they violated federal law in the past").

■ Accordingly, "[w]here the action is one for damages, past debts or retroactive relief of any type, it is barred whether it is brought in law, equity, or admiralty. Thus federal suits at law for return of improperly collected state taxes are barred." 1 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law—Substance and Procedure* § 2.12 (2d.ed.1992); *see Hafer v. Melo,* 502 U.S. 21, 30, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991)(stating "[T]he doctrine of *Ex parte Young* does not apply where a plaintiff seeks damages from the public treasury"); *Papasan v. Allain,* 478 U.S. 265, 278, 282, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (observing it is improper to "bestow an award for [an] accrued monetary liability"); *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 105–06, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Guardians Ass'n. v. Civil Serv. Com'n. of City of New York,* 463 U.S. 582, 604, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983); *Scheuer v. Rhodes,* 416 U.S. 232, 238, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (stating "[I]t is clear that the doctrine of *Ex parte Young* is of no aid to a plaintiff seeking damages from the public treasury[.]"); *Rehabilitation Ass'n. of Virginia, Inc. v. Kozlowski,* 42 F.3d 1444, 1449 (4th Cir.1994); *Austin v. Berryman,* 862 F.2d 1050, 1056 (4th Cir.1988); *Randall v. Lukhard,* 709 F.2d 257, 269 (4th Cir.1983); *Kimble v. Solomon,* 599 F.2d 599, 603 (4th Cir.1979).

■ In making the determination between prohibited and authorized relief, courts are

---

5. Plaintiffs rely heavily on the unpublished decision in *Consolidated Rail Corp. v. State Board of Equalization and Assessment of the State of New York,* No. 93 Civ. 6548(CLB) (S.D.N.Y. Nov. 27, 1996) which runs contrary to the 4–R Act analy-

sis in *Burton.* The Court finds the extended discussion and analysis in *Burton* more persuasive than the few paragraphs devoted to the issue in *Consolidated Rail.*

directed to "look to the substance rather than to the form of the relief sought[.]" *Papasan*, 478 U.S. at 279. What appears on its face as an easily drawn distinction often has proven difficult in application. *Edelman* lightly understated the proposition that "the difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* will not in many instances be ... between day and night." *Edelman*, 415 U.S. at 667; *Guardians Ass'n.*, 463 U.S. at 604; *Pennhurst*, 465 U.S. at 105; *Papasan*, 478 U.S. at 278; *Coakley v. Welch*, 877 F.2d 304, 306 (4th Cir.1989).

■ The elusive contours underlying the distinction arise from the principle that "a private person may bring an equitable action to force state officers to comply with federal law in the future *even though they will be required to spend state funds to so comply.*" 1 Ronald D. Rotunda & John E. Nowak, *supra* § 2.12 (emphasis added). The principle has been illustrated in many cases, with a representative discussion appearing in *Edelman*:

"The injunction issued in *Ex parte Young* was not totally without effect on the State's revenues, since the state law which the Attorney General was enjoined from enforcing provided substantial monetary penalties against railroads which did not conform to its provisions. Later cases from this Court have authorized equitable relief which has probably had greater impact on state treasuries than did that awarded in *Ex Parte Young*. In *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), Arizona and Pennsylvania welfare officials were prohibited from denying welfare benefits to otherwise qualified recipients who were aliens. In *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), New York City welfare officials were enjoined from following New York State procedures which authorized the termination of benefits paid to welfare recipients without prior hearing. But the fiscal consequences to state treasuries in these cases were the necessary result of compliance with decrees which by their terms were prospective in nature. *State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in Ex parte Young, supra.*"

415 U.S. 651, 667–68, 94 S.Ct. 1347, 39 L.Ed.2d 662 (emphasis added).[6]

Despite this language, however, the general rule precluding monetary relief that grants a retroactive claim on the funds of a state remains intact. *See, e.g., Missouri v. Jenkins*, 515 U.S. 70, 115 S.Ct. 2038, 2070 n. 5, 132 L.Ed.2d 63 (1995) (Thomas, J., concurring) (stating "Of course, the state treasury inevitably must fund a State's compliance

---

**6.** In *Papasan*, the Court further attempted to illuminate the distinction:

> Relief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred even when the state official is the named defendant. This is true if the relief is expressly denominated as damages. It is also true if the relief is tantamount to an award of damages for a past violation of federal law, even though styled as something else. On the other hand, relief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury.

478 U.S. at 278 (citations omitted). The *Papasan* opinion revealed the following voting coalitions:

WHITE, J., delivered the opinion of the Court, in which O'CONNOR, J., joined; in Parts I and III of which BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined; and in Part II of which BURGER, C.J., and POWELL and REHNQUIST, JJ., joined. BRENNAN, J., filed an opinion concurring in part, concurring in the judgment in part, and dissenting in part, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined .... BLACKMUN, J., filed an opinion concurring in part and dissenting in part .... POWELL, J., filed an opinion concurring in part and dissenting in part, in which BURGER, C.J., and REHNQUIST, J., joined....

The fractured *Papasan* opinion, and others like it, add a further measure of uncertainty for a lower court attempting to apply the theoretical distinctions involved.

with injunctions commanding prospective relief, but that does not require a State to supply money to comply with orders that have a backward-looking, compensatory purpose."); *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985)(stating "compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment."); *Guardians Ass'n.*, 463 U.S. at 604 (stating "The key question for present purposes is whether the decree requires the payment of funds or grants other relief, 'not as a necessary consequence of compliance in the future with a substantive federal question determination, but as a form of compensation' or other relief based on or flowing from violations at a prior time when the defendant 'was under no court-imposed obligation to conform to a different standard.' "); *Rehabilitation Ass'n.*, 42 F.3d at 1449; *Coakley*, 877 F.2d at 307; *Manning v. South Carolina Dep't. of Highway & Public Transp.*, 914 F.2d 44 (4th Cir.1990) (stating "the issuance of a declaratory judgment in these circumstances would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment."); *Austin v. Berryman*, 862 F.2d 1050, 1056 (4th Cir.1988) (stating "a retroactive benefits payment check, if made, would be at the request of the Comptroller and signed by the State Treasurer. Such a payment 'is in practical effect indistinguishable in many aspects from an award of damages against the State.' "); *Kimble*, 599 F.2d at 603 (noting the impropriety of an order that is, in effect, " 'a raid on the state treasury for an accrued monetary liability.' ")(quoted authority omitted).[7]

■ Defendants mount a two-pronged attack against Plaintiffs' attempts to circumvent the Eleventh Amendment bar via *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). First, Defendants assert there is nothing to prospectively enjoin for the 1996 tax year. Second, Defendants more inferentially assert that the requested relief would operate as an illegitimate award of retroactive damages for an accrued monetary liability. The assessment, collection and disbursement mechanisms of public utility taxation in West Virginia are implicated by the latter defense.

On or before May 1 each year the Railroads are required to file a return with the Board. Based on the return and other information, the Board assesses and fixes the true value of the Railroads' property. For the 1996 tax year, the Board finalized Defendants' proposed assessments on December 20, 1995. The state auditor certified the assessments to the counties in March 1996. The first half taxes were due no later than September 1, 1996. Plaintiffs paid the first half of these taxes on August 30, 1996 and instituted this action approximately one month later.

The state auditor is responsible for collecting and distributing Defendants' tax payments among the counties where the Railroads own property. Here, the first half tax payments have been made by the Plaintiffs and previously disbursed by the Defendant auditor, a portion going to the counties and a portion retained by the state treasury.[8] A

---

7. The *Edelman* decision provided further guidance that directly aids this Court:

> [One portion of the district court's decree] is measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials. Were we to uphold this portion ... we would be obligated to overrule the Court's holding in *Ford Motor Co. v. Department of Treasury, supra* [323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945)]. There a taxpayer, who had, under protest, paid taxes to the State of Indiana, sought a refund of those taxes from Indiana state officials who were charged with their collection. The taxpayer claimed that the tax had imposed in violation of the United States Constitution. *The term 'equitable restitution' would seem even*

> *applicable to the relief sought in that case, since the taxpayer had at one time had the money, and paid it over to the State pursuant to an allegedly unconstitutional tax exaction. Yet this Court had no hesitation in holding that the taxpayer's action was a suit against the State, and barred by the Eleventh Amendment.* We reach a similar conclusion with respect to the retroactive portion of the relief awarded by the District Court in this case.

> *Edelman*, 415 U.S. at 668–69 (emphasis added).

8. Percentage-wise, only a small portion is retained by the State. *See* W.Va.Code § 11–6–26 (stating "The auditor shall establish a special operating fund in the state treasury for the public utilities division in his or her office. The auditor

substantial amount of the monies transmitted to the counties funds public schools.

While Plaintiffs disagree, school funding is clearly a joint effort of the county boards of education and the State. W.Va.Code § 18–9A–1. Under the School Foundation Formula, each county contributes its "local share" toward school funding. The counties receive one dollar less in State aid for every dollar collectible as the local share. The funding scheme is explained in greater detail by the uncontested affidavit of Carolyn Arrington, Assistant State Superintendent for the West Virginia State Department of Education:

> The State of West Virginia provides funding for the basic foundation program for each county. The counties through receipt of property taxes collected by the county and by the State through its assessment of public utilities and other centrally assessed property then contributes its share toward the State's public schools.
>
> With regard to the 1996 tax assessments, the county boards of education have relied upon projected tax collections in preparing their proposed budgets.
>
> The projected tax collections used in preparing the proposed budget for the forthcoming year are based on the assessed valuations of the current year. For example, the projected tax collections for the 1996–97 fiscal year are based on the assessed valuations as certified by the assessor on March 3, 1996 (1996 Tax Year). For public utility property, the valuations are based on the ... date of December 31, 1994. For all other property, the valuations are based on the assessment date of July 1, 1995.
>
> The local share calculated under the Public School Support Program for the forthcoming year is also calculated on the current year's assessed valuations as certified by the assessor. The calculation is an estimation of the projected regular levy tax collections to be received by each county board of education during the subsequent year. For example, the assessed valuations used in the calculations for the 1996–97 fiscal year computations of State aid were those certified by the county assessors on March 3, 1996.
>
> Consequently, any reductions made to Tax Year 1996 assessments will have an adverse affect on the county boards' 1996–97 fiscal year revenues, since the assessments were used in the local share calculations to determine the State's appropriation under the Public School Support Program. Each board's share of State aid has been reduced as a result of the projected tax collections which are anticipated. *If revenues are not as anticipated because of a reduction in assessments, the county boards of education will experience a short-fall.* In addition, the boards with excess levies will realize an additional loss in revenues from the projected excess levy tax collections. As a result, the boards' actual collections will fall far short of the amounts used in preparing their proposed budgets for the 1996–97 year.
>
> *If the county revenues are not as anticipated, West Virginia law provides a mechanism which allows an adjustment to be made by the West Virginia Legislature to insure that appropriate funding is received by each county. Therefore, loss of any portion of the tax collections anticipated from the railroads will result in 1) a direct loss to the State in the amount of retained revenue and 2) a loss in funding for the state public schools.*

Aff. of Carolyn Arrington (emphasis added).

First, there is little doubt reductions in Plaintiffs' tax liability would impact the State treasury in some form, whether the Railroads were to be given a cash refund for overpaying the first half taxes or a credit against the amount of taxes due for the second half. The State fisc in either event would lose money directly via the loss of dedicated funds and the loss or shortfall of public education funding at the county level.

As Plaintiffs concede, the assessments became final in February 1996. Compl. ¶ 27.

---

shall pay into the fund three eighths of one percent of the gross receipts of all moneys collected as provided for in this article."). While

the percentage is small, the amount of actual dollars involved is likely significant.

The levying process also likely concluded months ago, although the Court has not been able to affix a precise date for the event. It is true the 4–R Act prohibits the unlawful assessment, levy or collection of certain taxes. 49 U.S.C. § 11501(b)(1)–(3). It is also true West Virginia has assessed, levied and collected taxes against the Plaintiff Railroads in violation of the 4–R Act recently. *See CSX Transp. Inc. v. Board of Public Works of the State of West Virginia*, 95 F.3d 318 (4th Cir.1996). While Plaintiffs complain about all three, the linchpin is the tax assessment, which became final some time ago. The collection, and even the levying process, are largely ministerial in nature. The only way Plaintiffs could secure the relief they seek would be for the assessment to be held invalid and changed. Unfortunately, such a retrospective order would be improper under *Ex Parte Young* and its most recent progeny, *Seminole Tribe, supra*. The primary violation of federal law occurred long ago when the assessment became final.

Of greater concern to the Court, however, is the "substance" of the relief sought. Regardless of their careful, formal pleading, the sum and substance of the Railroads' complaint is that (1) they were wronged when Defendants unlawfully assessed the 1996 taxes and proceeded to collect the first-half payment; and (2) Plaintiffs are entitled to some sort of a refund of the amount collected or a credit against the second-half payment. In the Court's view, Plaintiffs implicitly seek just the type of "backward-looking, compensatory" or accrued monetary relief barred by the Eleventh Amendment. *Jenkins*, 115 S.Ct. at 2070. As noted, this is directly analogous to a portion of the prohibited relief sought in *Edelman* which was "measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials." *Edelman*, 415 U.S. at 668. The past breach of a legal duty here occurred when Defendants improperly assessed Plaintiffs, holdings. As a result of this breach, Plaintiffs suffered a monetary loss which they now seek to remedy. Further, the necessary monetary relief would play a primary, not "ancillary," role in the crafting of an injunction.[9] Accordingly, the individual Defendants are entitled to Eleventh Amendment immunity.[10]

### III. CONCLUSION

The Court **GRANTS** Defendants' motion to dismiss pursuant to *Rule 12(b)(1), Federal Rules of Civil Procedure* and **DENIES** the requests for oral argument and to amend the complaint. The motion for a preliminary injunction is **DENIED** as moot.

**9.** The result is the same if Plaintiffs are viewed as seeking only a tax credit. The result would work a decrease in state revenues, and "[a] decrease in state revenues certainly and directly affects the state treasury." *See, e.g., Robbins Resource Recov. Partners, L.P. v. Edgar*, 947 F.Supp. 1205, 1209 (N.D.Ill.1996); *Swanson v. Powers*, No. 89–282–CIV–5–H, 1990 WL 545761, *5 (E.D.N.C. Aug.16, 1990), *rev'd. on other grounds*, 937 F.2d 965 (4th Cir.1991), *cert. denied*, 502 U.S. 1031, 112 S.Ct. 871, 116 L.Ed.2d 777 (1992)(stating "[A tax credit] remedy is still one for accrued monetary liability that would be satisfied out of the general revenues of the state ... [and] plaintiffs cannot avoid the eleventh amendment by receiving their award in the form of future tax credits, rather than present cash payments.").

**10.** As noted *supra*, Plaintiffs briefly argue they should be able to amend the complaint to add the individual counties where their property is located. As Defendants correctly note, however, the counties neither assess nor collect the taxes in question. They cannot provide the relief Plaintiffs seek. Accordingly, the requested amendment would be futile.