[No. B148574. Second Dist., Div. One. May 31, 2002.]

CIPRIANA ORTIZ, Plaintiff and Appellant, v.
LOS ANGELES POLICE RELIEF ASSOCIATION, INC., Defendant and
Respondent.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.B.2. through II.B.4.

1290

COUNSEL

Law Offices of Stephen Love, Stephen Love; Law Offices of Stephen Ebner and Stephen Ebner for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Richard L. Lotts and Beth S. Sonnenklar for Defendant and Respondent.

OPINION

**MALLANO, J.**—Plaintiff Cipriana Ortiz was employed by an association to assist in the processing of insurance benefits for current and former officers

of the Los Angeles Police Department (LAPD). In that capacity, Ortiz had access to files containing confidential information about the officers.

Ortiz became romantically involved with a felon who was incarcerated. She planned to marry him. Ortiz's superiors, upon learning of this, concluded that she had a conflict of interest because she had an intimate relationship with an inmate and access to confidential information about law enforcement personnel. Ortiz's employer gave her the choice of ending the relationship or terminating her employment. Ortiz chose the latter and then filed this action.

The principal issue on appeal is whether Ortiz's discharge violated her right to privacy under the state Constitution (Cal. Const., art. I, § 1). We conclude that her employer's enforcement of the conflict of interest policy was a rational response to a legitimate employer interest. Accordingly, we agree with the trial court and affirm.

I

BACKGROUND

In 1989, Ortiz commenced employment with the Los Angeles Police Relief Association, Inc. (LAPRA), a private nonprofit association having the principal function of managing and administering the employee benefits of current and former LAPD officers. Those benefits include medical, life, and dental insurance, and off-duty disability coverage. LAPRA's membership is comprised of about 16,000 current and former LAPD officers and around 200 undercover officers. All members of LAPRA's board of directors are active or retired law enforcement officers.

LAPRA's office staff consists of 15 employees. Ortiz was employed as "Administrator of Retirement and Promotion Benefits" in connection with medical benefits and life insurance. She enrolled active officers in the program, administered benefits, adjusted and paid claims, processed retirements, and answered questions about employee benefits. From the time she was hired, Ortiz knew that she had to uphold high ethical and conduct standards at work and off the job. Ortiz was an at-will employee.

On a daily basis, Ortiz utilized members' confidential files as part of the routine performance of her job duties. Those files include officers' names, residential addresses, telephone numbers, medical histories, information about the officers' family status, and the names and addresses of their spouses and children. The information on undercover officers is even more

tightly guarded. Their names do not appear on the police roster, and the LAPD will not publicly acknowledge their employment.

The confidential treatment of the members' records at LAPRA is consistent with the way in which officers conduct their personal lives. For example, officers do not list their residential address or telephone number in telephone directories or informational services. In addition, many officers do not include their address on the forms used by the Department of Motor Vehicles.

In August 1999, Ramona Voge became the executive director of LAPRA. Prior to that time, she had worked directly for the LAPD for 26 years, including 13 years in internal affairs. In staff meetings at LAPRA, Voge told employees that it was important to avoid even the appearance of impropriety. She advised employees not to drink and drive, not to go to parties where illegal drugs were being used, and not to fraternize with gang members or known criminals.

In February 1998, Ortiz was romantically involved with a felon, Michael Estrada, who was incarcerated at the California Substance Abuse Center at Corcoran State Prison. Estrada had served three years of a 15-year sentence for burglary.

In early 1999, Ortiz and Estrada became engaged and decided that they would marry sometime in June 2000. On or about January 24, 2000, Ortiz approached Voge about taking a day off for the wedding. During the conversation, Ortiz stated that her fiancé was in prison. Prior to this conversation, Ortiz had not told anyone at LAPRA that she was romantically involved with an inmate, nor had she spoken about her engagement or the wedding. Ortiz may have told a coworker that she was corresponding with an inmate.

Voge believed that, in light of Ortiz's access to confidential information about LAPD officers, Ortiz's relationship with Estrada created an actual or potential conflict of interest. Voge expressed this concern to Ortiz, stating that Ortiz's relationship with an inmate could jeopardize the personal safety of LAPRA's members. Voge also said that even if Ortiz did not want to disclose any of the officers' information to Estrada, he or others could attempt to get the information through threats, coercion, deceit, or violence. Ortiz stated that she would not end the relationship with Estrada, and she did not think the relationship would present a problem with her job.

Shortly after January 25, 2000, Voge told Ortiz's immediate supervisor, Craig Stokes, about Ortiz's relationship with Estrada. Voge also restated her belief that a conflict of interest existed.

On January 28, 2000, Ortiz, Voge, Stokes, and another supervisor met to discuss Ortiz and Estrada's relationship and determined that Estrada knew about Ortiz's job. Voge urged Ortiz to take some time to think about whether she wanted to continue her relationship with him. Ortiz replied that she had already made her decision and that she was willing to risk her job to continue the relationship. Voge told Ortiz that a formal report would be submitted to the board of directors, and the board would make a decision about her employment.

In February 2000, the board of directors decided that Ortiz would have to resign if she intended to maintain her relationship with Estrada. Thereafter, near the end of February, Voge met with Ortiz. Voge began by asking Ortiz if she still intended to continue her relationship with Estrada. Ortiz said she did. Voge explained that, due to an unavoidable conflict of interest resulting from Ortiz's relationship with an inmate, the board had decided she could no longer work for LAPRA.

The board gave Ortiz the opportunity to resign in good standing. Voge said she would write a favorable letter of recommendation for Ortiz, would serve as a good job reference, and would use her list of contacts to help Ortiz find a job where her fiancé's status as a felon or inmate would not be a concern. Ortiz replied that she would not resign.

On March 3, 2000, Voge met with Ortiz and asked her one last time if she still intended to continue her relationship with Estrada. Ortiz said she did. In reply, Voge said that because Ortiz refused to resign and would not end her relationship with Estrada, her employment was being terminated, effective immediately. During the conversation, Voge reiterated that "the reason for the board's decision was based on the unacceptable—and potentially deadly—conflict of interest between [Ortiz's] job duties . . . and her intimate relationship with the convicted felon."

By letter of the same date, Voge stated: "The Board of Directors recently learned of your ongoing relationship with a known felon. Based on said relationship, the Board of Directors has decided to terminate your employment with [LAPRA], effective immediately, as of March 3, 2000. This decision is based on the fact that as a LAPRA staff member you have access to Los Angeles Police Officers['] confidential personnel and medical files. These files are considered extremely confidential and are protected by State and Federal Penal and Government codes. Your personal relationship with Michael Estrada, a known felon, and a person who is currently serving 15 years for Burglary . . . presents a serious and unacceptable conflict of interest to the objectives of LAPRA and the safety of its members."

Two months later, on May 2, 2000, Ortiz filed this action against LAPRA, alleging causes of action for (1) sex discrimination in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), (2) violation of the state constitutional right of privacy (Cal. Const., art. I, § 1), (3) violation of the right to freedom of association, (4) discrimination based on marital status in violation of the FEHA, and (5) wrongful termination in violation of public policy.

LAPRA demurred to the sex and marital status discrimination claims. Ortiz filed opposition. The trial court sustained the demurrer without leave to amend as to the sex discrimination claim and overruled the demurrer on the marital status claim. The action proceeded as to the four remaining claims.

On December 29, 2000, LAPRA filed a motion for summary judgment. Ortiz filed opposition papers. In a signed order filed February 7, 2001, and a minute order dated February 8, 2001, the trial court granted the motion. Judgment was entered on February 20, 2001. Ortiz filed a timely appeal.

## II

### DISCUSSION

Based on the principles governing summary judgment and the substantive law applicable to Ortiz's claims, we conclude that LAPRA was entitled to summary judgment.

### A. *Summary Judgment*

A motion for summary judgment must be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

■ " 'A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of material fact. . . . [T]he moving party's affidavits are strictly construed while those of the opposing party are liberally construed.' . . . We accept as undisputed facts only those portions of the moving party's evidence that are not

contradicted by the opposing party's evidence. . . . In other words, the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences therefrom must be accepted as true." (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 178-179 [70 Cal.Rptr.2d 96], citations omitted.)

■ "[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion thereon. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493], citation and fn. omitted.)

"[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . .

"[The way in which] the parties moving for, and opposing, summary judgment may each carry their burden of persuasion and/or production depends on which [party] would bear what burden of proof at trial." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at pp. 850-851, italics omitted.)

## B. *Causes of Action*

Ortiz does not challenge the dismissal of the sex discrimination claim on demurrer. Instead, she argues that the trial court erred in granting summary judgment on the other claims: invasion of privacy, marital status discrimination, wrongful termination in violation of public policy, and violation of the right to freedom of association. We conclude that LAPRA is entitled to judgment as a matter of law.

### 1. *State Constitutional Right of Privacy*

Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting

property, and pursuing and obtaining safety, happiness, and *privacy*." (Italics added.)

"The phrase 'and privacy' was added to California Constitution, article I, section 1 by an initiative adopted by the voters on November 7, 1972 (the Privacy Initiative or Amendment). . . . [¶] . . . [¶]

■ "[T]he Privacy Initiative [as codified] in article I, section 1 of the California Constitution creates a right of action against private as well as government entities." (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 15-20 [26 Cal.Rptr.2d 834, 865 P.2d 633] (*Hill*).) " 'The constitutional provision is self-executing; hence it confers a judicial right of action on all Californians. . . . Privacy is protected not merely against state action; it is considered an inalienable right which may not be violated by anyone.' " (*Id.* at p. 18, citation omitted, quoting *Porten v. University of San Francisco* (1976) 64 Cal.App.3d 825, 829 [134 Cal.Rptr. 839].)

### a. *Elements of a Privacy Claim*

■ "[A] plaintiff alleging an invasion of privacy in violation of the state constitutional right to privacy must establish each of the following [elements]: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy.

"Whether a legally recognized privacy interest is present in a given case is a question of law to be decided by the court. . . . Whether plaintiff has a reasonable expectation of privacy in the circumstances and whether defendant's conduct constitutes a serious invasion of privacy are mixed questions of law and fact. If the undisputed material facts show no reasonable expectation of privacy or an insubstantial impact on privacy interests, the question of invasion may be adjudicated as a matter of law." (*Hill, supra,* 7 Cal.4th at pp. 39-40, citations omitted.)

We examine the three elements of a constitutional privacy claim in deciding whether LAPRA's invasion of Ortiz's privacy was de minimis. If it was, our inquiry is at an end. If it was not, we must balance the parties' competing interests. (See *Hill, supra,* 7 Cal.4th at pp. 37-38, 43.)

### (i) *A legally protected privacy interest*

"Article I, section 1 of the California Constitution is an enumeration of the 'inalienable rights' of all Californians. 'Privacy' is declared to be among

those rights. Typical of broad constitutional declarations of rights, the section does not define 'privacy' or explain its relationship to other rights or interests. Nor does it specify how or against whom the right of privacy is to be safeguarded. . . .

■ "The Privacy Initiative is to be interpreted and applied in a manner consistent with the probable intent of the body enacting it: the voters of the State of California. . . . When, as here, the language of an initiative measure does not point to a definitive resolution of a question of interpretation, ' "it is appropriate to consider indicia of the voters' intent other than the language of the provision itself." . . . Such indicia include the analysis and arguments contained in the official ballot pamphlet.' " (Hill, supra, 7 Cal.4th at p. 16.)

■ Privacy interests generally fall into one of two categories: (1) an interest in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ("autonomy privacy"); and (2) an interest in precluding the dissemination or misuse of sensitive and confidential information ("informational privacy"). (Hill, supra, 7 Cal.4th at p. 35.)

As stated in the ballot pamphlet for the Privacy Initiative, "the constitutional right to privacy encompasse[s] a variety of rights involving private choice[, or autonomy,] in personal affairs. 'The right to privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communication, and our freedom to associate with the people we choose. . . . [¶]. . . . The right of privacy is an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, Fifth, and Ninth Amendments to the U.S. Constitution. . . .' " (Robbins v. Superior Court (1985) 38 Cal.3d 199, 212 [211 Cal.Rptr. 398, 695 P.2d 695].) "Autonomy privacy is . . . a concern of the Privacy Initiative. The ballot arguments refer to the federal constitutional tradition of safeguarding certain intimate and personal decisions from government interference in the form of penal and regulatory laws." (Hill, supra, 7 Cal.4th at p. 36.)

"Informational privacy is the core value furthered by the Privacy Initiative. . . . A particular class of information is private when well-established social norms recognize the need to maximize individual control over its dissemination and use [and] to prevent unjustified embarrassment or indignity. Such norms create a threshold reasonable expectation of privacy in the data at issue. As the ballot argument observes, the California constitutional

right of privacy 'prevents government and business interests from [1] collecting and stockpiling unnecessary information about us and from [2] misusing information gathered for one purpose in order to serve other purposes or to embarrass us.' " (*Hill, supra,* 7 Cal.4th at pp. 35-36.)

■ The constitutional right of privacy under state law is quite broad. In addition to the right of personal autonomy and the protection of private information, the state Constitution ensures the freedom of association. (See *City of Santa Barbara v. Adamson* (1980) 27 Cal.3d 123, 126-130 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219]; *Planned Parenthood Golden Gate v. Superior Court* (2000) 83 Cal.App.4th 347, 357-360 [99 Cal.Rptr.2d 627].) And just as the right of privacy protects two distinct interests— personal autonomy and private information—the right to freely associate protects two types of association—intimate and expressive association.

In *Warfield v. Peninsula Golf & Country Club* (1995) 10 Cal.4th 594 [42 Cal.Rptr.2d 50, 896 P.2d 776] (*Warfield*), our Supreme Court discussed the rights of free association and privacy under the federal and state Constitutions (*id.* at p. 624), stating:

"[T]here are two aspects of the constitutional right of association that must be considered . . . : (1) the freedom of intimate association, and (2) the freedom of expressive association. . . .

"With regard to the freedom of *intimate* association, . . . the highly personal relationships that are sheltered by this constitutional guaranty are exemplified by 'those that attend the creation and sustenance of a family— marriage . . . , childbirth . . . , the raising and education of children . . . and cohabitation with one's relatives . . . .' . . . 'Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctly personal aspects of one's life. . . . [Those relationships] are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty. Conversely, an association lacking these qualities—such as a large business enterprise—seems remote from the concerns giving rise to this constitutional protection. Accordingly, the Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse that would not apply to regulations affecting the choice of one's fellow employees. . . .' "

(*Warfield, supra,* 10 Cal.4th at pp. 624-625, citation omitted, italics added, quoting *Roberts v. United States Jaycees* (1984) 468 U.S. 609, 619-620 [104 S.Ct. 3244, 3250-3251, 82 L.Ed.2d 462].)

"With regard to the freedom of *expressive* association, . . . '[courts] have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.' " (*Warfield, supra,* 10 Cal.4th at p. 626, italics added.)

Thus, under the state Constitution, the right to marry and the right of intimate association are virtually synonymous. For convenience, we will refer to the privacy right in this case as the right to marry.

Beyond question, "[t]he present case . . . concerns a relationship lying within the zone of privacy created by several fundamental constitutional guarantees. . . . [There are definite] notions of privacy surrounding the marriage relationship. [¶] We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions." (*Griswold v. Connecticut* (1965) 381 U.S. 479, 485-486 [85 S.Ct. 1678, 1682, 14 L.Ed.2d 510], quoted with approval in *Tylo v. Superior Court* (1997) 55 Cal.App.4th 1379, 1384 [64 Cal.Rptr.2d 731].)

██ Courts have "repeated[ly] acknowledg[ed] . . . a 'right of privacy' or 'liberty' in matters related to marriage, family, and sex." (*People v. Belous* (1969) 71 Cal.2d 954, 963 [80 Cal.Rptr. 354, 458 P.2d 194]; accord, *Committee to Defend Reproductive Rights v. Myers* (1981) 29 Cal.3d 252, 275 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118].) "[T]he state has a strong interest in the marriage relationship . . . . [¶] . . . [¶] . . . The policy favoring marriage is 'rooted in the necessity of providing an institutional basis for defining the fundamental relational rights and responsibilities of persons in organized society.' " (*Elden v. Sheldon* (1988) 46 Cal.3d 267, 274-275 [250 Cal.Rptr. 254, 758 P.2d 582].) "Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival." (*Loving v. Virginia* (1967) 388 U.S. 1, 12 [87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010] (*Loving*).) "[T]he right to marry is the right to join in marriage with the person of one's choice . . . ." (*Perez v. Sharp* (1948) 32 Cal.2d 711, 715 [198 P.2d 17].)

In California, the right to marry is so fundamental that state legislation and the Constitution protect an *inmate's* right to marry. By statute, "each person [sentenced to imprisonment in a state prison] shall have the following civil rights: [¶] . . . [¶] . . . To marry." (Pen. Code, § 2601, subd. (e).) That statute was applied in *In re Carrafa* (1978) 77 Cal.App.3d 788 [143 Cal.Rptr. 848], where the court stated: "The right to marry is a fundamental constitutional right. . . . The codification of that right emphasizes its fundamental nature. . . . [¶] . . . [¶] . . . The right to marry may not be impinged or delayed unless security is endangered at the time and place of the marriage." (*Id.* at pp. 791-793, citations omitted.) And in *Turner v. Safley* (1987) 482 U.S. 78 [107 S.Ct. 2254, 96 L.Ed.2d 64], the Supreme Court explained:

"[A] prison inmate 'retains those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.' . . . The right to marry, like many other rights, is subject to substantial restrictions as a result of incarceration. Many important attributes of marriage remain, however, after taking into account the limitations imposed by prison life. . . . [I]nmate marriages, like others, are expressions of emotional support and public commitment. . . . [F]or some inmates and their spouses, . . . the commitment of marriage may be an exercise of religious faith as well as an expression of personal dedication. . . . [M]arital status often is a precondition to the receipt of government benefits . . . , property rights . . . , and, other, less tangible benefits (*e.g.*, legitimation of children born out of wedlock). . . .

"Taken together, we conclude that these . . . elements are sufficient to form a constitutionally protected marital relationship in the prison context." (*Turner v. Safley, supra,* 482 U.S. at pp. 95-96 [107 S.Ct. at p. 2265], citation omitted.)

In short, the right to marry is a fundamental right in this country, as reflected and guaranteed by state and federal law.

### (ii) *Reasonable expectation of privacy*

■ " 'The extent of [a privacy] interest is not independent of the circumstances.' . . . Even when a legally cognizable privacy interest is present, other factors may affect a person's reasonable expectation of privacy. . . .

"In addition, customs, practices, and physical settings surrounding particular activities may create or inhibit reasonable expectations of privacy. . . .

"A 'reasonable' expectation of privacy is an objective entitlement founded on broadly based and widely accepted community norms. . . . 'The protection afforded to the plaintiff's interest in his privacy must be relative to the customs of the time and place, to the occupation of the plaintiff and to the habits of his neighbors and fellow citizens.'

"[And] the presence or absence of opportunities to consent voluntarily to activities impacting privacy interests obviously affects the expectations of the participant." (*Hill, supra*, 7 Cal.4th at pp. 36-37.)

As a preliminary matter, we note the difficulty of applying the "expectation of privacy" element in the context of marriage. By way of example, one of the seminal cases on the right to marry, *Loving, supra*, 388 U.S. 1, involved a challenge to Virginia's statutory ban on interracial marriages. Richard Loving, a Caucasian, and Mildred Jeter, an African-American, both of whom resided in Virginia, were married in June 1958. Within a few months, a grand jury indicted them for violating Virginia's antimiscegenation statutes, which made interracial marriage a felony. The Lovings pleaded guilty. The trial court sentenced them to one year in jail but suspended the sentence on the condition that they leave the state and not return for 25 years.

The Lovings relocated to the District of Columbia and filed a motion in Virginia state court to vacate the judgment of conviction and set aside the sentence on the ground that the antimiscegenation statutes violated the Fourteenth Amendment to the United States Constitution. The state courts upheld the statutes. The United States Supreme Court reversed, holding in a unanimous decision that the Virginia law violated the equal protection clause and the due process clause. (*Loving, supra*, 388 U.S at p. 12 [87 S.Ct. at p. 1824].)

Under the analysis in *Hill, supra*, 7 Cal.4th 1, the Lovings arguably did not have a reasonable expectation of privacy with respect to the right to marry. The marriage itself was a crime, and the Lovings made no attempt to keep it a secret. In fact, the marriage was of sufficient public knowledge that it came to the attention of a grand jury, resulting in an indictment and conviction. And the Lovings' subsequent judicial proceedings to overturn the antimiscegenation statutes were entirely public. Yet, notwithstanding the widespread knowledge of the Lovings' marriage, the Supreme Court held that they had a constitutional right to marry.

As for the present case, we apply the "expectation of privacy" element to Ortiz's claim of personal autonomy, namely, the right to marry.

(See *Hill, supra,* 7 Cal.4th at pp. 36-37, 40-43.) In that regard, LAPRA did not routinely question its employees about their personal lives. Nor did it conduct investigations in that area, aside from verifying information provided by job applicants. Further, Ortiz did not disclose her relationship with Estrada until two years after she became romantically involved with him. Even then, it was for the sole purpose of setting a date for the wedding.

Ortiz limited the disclosure of the marriage to one person—Voge—in asking for a day off. During that conversation, Ortiz told Voge, among other things, that her fiancé was an inmate. Ortiz also said she did not think her relationship with Estrada would interfere with her work. Ortiz's immediate supervisor, Craig Stokes, testified at his deposition that he did not doubt Ortiz's honesty, he had no complaints about her job performance, and she had never disobeyed his instructions.

LAPRA argues that, because Ortiz voluntarily told Voge that her fiancé was in prison, Ortiz has no privacy claim. That disclosure alone, so the argument goes, completely stripped Ortiz of her constitutional rights. We disagree. The state Constitution " 'imposes constraints on [an employer's] power to control *the selection of one's spouse* . . . .' " (*Warfield, supra,* 10 Cal.4th at p. 625, italics added.) "[T]he right to marry is the right to join in marriage with *the person of one's choice* . . . ." (*Perez v. Sharp, supra,* 32 Cal.2d at p. 715, italics added.) At a minimum, Ortiz's right to marry should be balanced against LAPRA's countervailing interests. (See pt. II.B.1.b., *post* [balancing parties' interests].)

In addition, the state Constitution guarantees not only the right to marry but also the related right to freedom of intimate association. Ortiz did not sacrifice the whole of her intimate relationship with Estrada by telling Voge about one aspect of it. On the contrary, Ortiz "conducted . . . herself in a manner consistent with an actual expectation of privacy, i.e., . . . she [did] not . . . manifest[] by . . . her conduct a voluntary consent to the invasive actions of defendant." (*Hill, supra,* 7 Cal.4th at p. 26.)

Accordingly, Ortiz's conversation with Voge about choosing a wedding date, by itself, did not cost Ortiz her constitutional rights.

(iii) *Seriousness of invasion of privacy interest*

"No community could function if every intrusion into the realm of private action, no matter how slight or trivial, gave rise to a cause of action for invasion of privacy. . . . Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to

constitute an egregious breach of the social norms underlying the privacy right. Thus, the extent and gravity of the invasion is an indispensable consideration in assessing an alleged invasion of privacy." (*Hill, supra,* 7 Cal.4th at p. 37.)

 The invasion of Ortiz's right of privacy was "serious" in every sense of the word. LAPRA vetoed her choice of spouses. If she wanted to keep her job of 11 years, she had to give up her plans to marry Estrada and bring an abrupt halt to their two-year relationship.

In sum, the seriousness of the invasion into Ortiz's right to marry, together with the showing on the other two elements of a constitutional privacy claim, leads to the conclusion that Ortiz's privacy claim is not de minimis. Further inquiry is necessary. We therefore proceed to balance the parties' competing interests. (See *Hill, supra,* 7 Cal.4th at p. 43.)

### b. *Competing Interests*

 "A defendant may prevail in a state constitutional privacy case by negating any of the three elements just discussed or by pleading and proving, as an affirmative defense, that the invasion of privacy is justified because it substantively [serves] one or more countervailing interests. The plaintiff, in turn, may rebut a defendant's assertion of countervailing interests by showing there are feasible and effective alternatives to defendant's conduct which have a lesser impact on privacy interests. Of course, a defendant may also plead and prove other available defenses, e.g., consent, unclean hands, etc., that may be appropriate . . . .

"The existence of a sufficient countervailing interest or an alternative course of conduct present threshold questions of law for the court. The relative strength of countervailing interests and the feasibility of alternatives present mixed questions of law and fact. . . . [I]n cases where material facts are undisputed, adjudication as a matter of law may be appropriate." (*Hill, supra,* 7 Cal.4th at p. 40.)

"Privacy concerns are not absolute; they must be balanced against other important interests. . . . '[N]ot every act which has some impact on personal privacy invokes the protections of [our Constitution] . . . . [A] court should not play the trump card of unconstitutionality to protect absolutely every assertion of individual privacy.' . . .

"The diverse and somewhat amorphous character of the privacy right necessarily requires that privacy interests be specifically identified and

carefully compared with competing or countervailing privacy and nonprivacy interests in a 'balancing test.' . . . [¶] Invasion of a privacy interest is not a violation of the state constitutional right to privacy if the invasion is justified by a competing interest. . . . Conduct alleged to be an invasion of privacy is to be evaluated based on the extent to which it furthers legitimate and important competing interests." (*Hill, supra,* 7 Cal.4th at pp. 37-38, citations omitted.)[1]

In *Hill, supra,* 7 Cal.4th 1, the court "decline[d] to hold that every assertion of a privacy interest under [the state Constitution] must be overcome by a 'compelling interest.' " (*Id.* at pp. 34-35.) Because the constitutional right of privacy applies to private, as well as public, action (*id.* at pp. 15-20), the court explained that the "[j]udicial assessment of the relative strength and importance of privacy norms and countervailing interests may differ in cases of private, as opposed to government, action" (*id.* at p. 38).

The court distinguished public action from private action, stating, "the pervasive presence of coercive government power in basic areas of human life typically poses greater dangers to the freedoms of the citizenry than actions of private persons." (*Hill, supra,* 7 Cal.4th at p. 38.) " '[A]n individual generally has greater choice and alternatives in dealing with private actors . . . .' . . . [I]ndividuals usually have a range of choice among landlords, employers, vendors and others with whom they deal." (*Id.* at pp. 38-39.)

The court continued: "These generalized differences between public and private action may affect privacy rights differently in different contexts. If, for example, a plaintiff claiming a violation of the state constitutional right to privacy was able to choose freely among competing public or private entities in obtaining access to some opportunity, commodity, or service, his or her privacy interest may weigh less in the balance. In contrast, if a public or private entity controls access to a vitally necessary item, it may have a correspondingly greater impact on the privacy rights of those with whom it deals." (*Hill, supra,* 7 Cal.4th at p. 39.)

 In balancing the parties' interests here, we find it helpful to look to federal cases where individuals have challenged government-imposed burdens on the right to marry.

---

[1]The same provision of the California Constitution that guarantees the right to privacy also confers the right of "pursuing and obtaining safety." (Cal. Const., art. I, § 1.) LAPRA does not rely on the constitutional right to safety in balancing the parties' interests. Given that, we do not discuss it. Nor have the parties addressed the effect, if any, of Labor Code section 96, subdivision (k), which authorizes the Labor Commissioner to pursue "[c]laims for loss of wages as the result of [an employee's] demotion, supension, or discharge from employment for lawful conduct occurring during nonworking hours away from the employer's premises."

As stated, in *Loving, supra*, 388 U.S. 1, the Supreme Court struck down Virginia's antimiscegenation statutes, holding that "[t]he freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness . . . ." (*Id.* at p. 12 [87 S.Ct. at p. 1824].) The court found that the statutes violated due process and equal protection of the laws.

In *Califano v. Jobst* (1977) 434 U.S. 47 [98 S.Ct. 95, 54 L.Ed.2d 228] (*Jobst*), the court upheld a Social Security provision that terminated benefits to a disabled dependent child who married a person not eligible for Social Security benefits. The court concluded that the provision did not violate due process, explaining:

"Both tradition and common experience support the conclusion that marriage is an event which normally marks an important change in economic status. . . . [T]here can be no question about the validity of the assumption that a married person is less likely to be dependent on his parents for support than one who is unmarried.

"Since it was rational for Congress to assume that marital status is a relevant test of probable dependency, the general rule . . . terminating all child's benefits when the beneficiary married, satisfied the constitution[] . . . . That general rule is not rendered invalid simply because some persons who might otherwise have married were deterred by the rule or because some who did marry were burdened thereby." (*Jobst, supra*, 434 U.S at pp. 53-54 [98 S.Ct. at p. 99].)

In *Zablocki v. Redhail* (1978) 434 U.S. 374 [98 S.Ct. 673, 54 L.Ed.2d 618] (*Zablocki*), the court reviewed a statute requiring Wisconsin residents with child support obligations to obtain a court order before they could marry. Under the statute, courts could grant permission only if the obligated parent could produce proof of support and could demonstrate that the children receiving support were not likely to become public charges. The court invalidated the statute on equal protection grounds, stating:

"It is not surprising that the decision to marry has been placed on the same level of importance as decisions relating to procreation, childbirth, child rearing, and family relationships. As the facts of this case illustrate, it would make little sense to recognize a right of privacy with respect to other matters of family life and not with respect to the decision to enter the relationship that is the foundation of the family in our society. . . .

"By reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the

incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, *reasonable* regulations that do not *significantly interfere* with decisions to enter into the marital relationship may legitimately be imposed. . . . The statutory classification at issue here, however, clearly does interfere directly and substantially with the right to marry." (*Zablocki, supra,* 434 U.S. at pp. 386-387 [98 S.Ct. at p. 681], italics added.)

In *Zablocki,* the court distinguished *Jobst, supra,* 434 U.S 47, on the ground that "[t]he directness and substantiality of the interference with the freedom to marry distinguish the instant case from *Califano v. Jobst* . . . . In *Jobst,* we upheld sections of the Social Security Act providing, *inter alia,* for termination of a dependent child's benefits upon marriage to an individual not entitled to benefits under the Act. As the opinion for the Court expressly noted, the rule terminating benefits upon marriage was not 'an attempt to interfere with the individual's freedom to make a decision as important as marriage.' . . . The Social Security provisions placed no direct legal obstacle in the path of persons desiring to get married, and . . . there was no evidence that the laws significantly discouraged, let alone made 'practically impossible,' any marriages." (*Zablocki, supra,* 434 U.S. at p. 387, fn. 12 [98 S.Ct. at pp. 681-682].)

In *Austin v. Berryman* (4th Cir. 1988) 862 F.2d 1050, affirmed in relevant part on rehearing en banc (4th Cir. 1989) 878 F.2d 786, a wife quit her job and moved to another city to be with her husband. She could not find work and applied for unemployment compensation. The claim was denied. Under state law, benefits were not permitted if an employee quit work to follow a spouse to a new locality. The wife challenged the law on due process grounds. The court upheld the statute, stating: "[W]e conclude that the . . . statute does not 'directly and substantially' interfere with the fundamental right to marry or the fundamental right to live together as a family. . . . [The statute], which makes ineligible for unemployment compensation an employee who quits work to follow his or her spouse to a new place of residence, does not 'order or prevent' spouses or families from living together. . . . Therefore, we hold that the [state] statute does not significantly burden a fundamental right. Under the proper standard of review, we think that the [state] legislature had a rational basis to protect the unemployment compensation fund from what it determined are unmerited claims." (*Austin v. Berryman, supra,* 862 F.2d at p. 1055.)

For additional guidance in balancing the parties' interests, we turn to a series of antinepotism cases decided by the United States Courts of Appeals. In general, these cases involve a public employer's policy that relatives are not allowed to supervise one another.

In *Parks v. City of Warner Robins, Ga.* (11th Cir. 1995) 43 F.3d 609 (*Parks*), the Eleventh Circuit Court of Appeals upheld a city's antinepotism policy that barred spouses from supervising one another in the same department. If the policy was violated, the spouse with less seniority would be discharged. The plaintiff argued that the policy violated due process and the First Amendment right to freedom of association. In upholding the policy under the due process clause, the court explained:

"We conclude that the [employer's] anti-nepotism policy does not directly and substantially interfere with the right to marry. The policy does not create a direct legal obstacle that would prevent absolutely a class of people from marrying. While the policy may place increased economic burdens on certain city employees who wish to marry one another, the policy does not forbid them from marrying. . . .

"[I]ndividual instances of hardship notwithstanding, the anti-nepotism policy at issue here does not make marriage practically impossible for a particular class of persons. . . .

"Because the [antinepotism] policy does not directly and substantially interfere with the fundamental right to marry, we subject the policy to rational basis scrutiny. . . . Accordingly, the statute will not violate the Due Process Clause if it is rationally related to a legitimate government interest. . . ." (*Parks, supra,* 43 F.3d at pp. 614-615.)

The court in *Parks* rejected the plaintiff's freedom of association claim on the ground that "[t]he [city's] anti-nepotism policy does not 'order' individuals not to marry, nor does it 'directly and substantially' interfere with the right to marry. . . . Because the anti-nepotism policy does not prevent the less-senior spouse from working in another department or outside the . . . municipal government . . . , it is unlikely that the policy will actually prevent affected couples from marrying." (*Parks, supra,* 43 F.3d at p. 616; accord, *Montgomery v. Carr* (6th Cir. 1996) 101 F.3d 1117, 1126 [rejecting argument that antinepotism policy violated First Amendment right to freedom of association].)

In *Waters v. Gaston County, N.C.* (4th Cir. 1995) 57 F.3d 422, the Fourth Circuit Court of Appeals rejected a due process challenge to a county's antinepotism policy, explaining:

"Unless a law interferes directly and substantially with the fundamental right to marriage, it is not subject to strict scrutiny. Here, the County's policy is a work-related restriction with incidental effects on the [plaintiffs']

marriage. Although it may touch upon the marriage relationship between County employees in the same department, it does not 'directly and substantially' interfere with that right by preventing those who wish to marry from doing so. The Policy does not forbid marriage altogether (as in *Loving*[, *supra*, 388 U.S. 1]) or forbid it without permission of the State (as in *Zablocki*[, *supra*, 434 U.S. 374]). At most, it is an unwelcome hurdle, forcing one spouse to attempt to transfer to another department within the County or to leave the County's employ altogether. We cannot conclude that the Policy sufficiently impacts a fundamental right so as to trigger strict scrutiny. [¶] . . . [¶]

"[W]e facially review the Policy to determine whether there was a rational basis for its passage. . . . We have no trouble concluding that the Policy passes muster under a rational basis review." (*Waters v. Gaston County, N.C.*, *supra*, 57 F.3d at p. 426, fns. omitted.)

In *Parsons v. County of Del Norte* (9th Cir. 1984) 728 F.2d 1234, the Ninth Circuit Court of Appeals upheld an antinepotism policy challenged on grounds of due process and equal protection, stating: "Only when a government regulation directly and substantially interferes with the fundamental incidents of marriage is . . . strict scrutiny applicable. . . . Where fundamental rights are not substantially burdened the regulation will be upheld unless there is no rational basis for its enactment. . . .

"The County asserts justification for the rule in that it avoids conflicts of interest and favoritism in employee hiring, supervision, and allocation of duties. The structure of the rule bears a rational relationship to this end and therefore passes constitutional muster." (*Parsons v. County of Del Norte*, *supra*, 728 F.2d at p. 1237, citations omitted.)

In short, "[v]irtually every court to have confronted a challenge to an anti-nepotism policy on First Amendment, . . . due process, equal protection, or other grounds has applied rational basis scrutiny." (*Montgomery v. Carr*, *supra*, 101 F.3d at p. 1126 [citing cases].)

Based on these authorities, we conclude that LAPRA's conflict of interest rule is valid if it is rationally related to a legitimate employer interest. That rule does not warrant analysis under a standard of strict scrutiny; it does not resemble the antimiscegenation statutes in *Loving*, *supra*, 388 U.S. 1, or the burden placed on persons with child support obligations in *Zablocki*, *supra*, 434 U.S. 374. The rule is not a flat prohibition on marriage that affects entire classes of individuals statewide. LAPRA did not (and could not) prohibit Ortiz and Estrada from getting married. Rather, like an antinepotism policy, LAPRA required Ortiz to choose between marriage and her job.

LAPRA's conflict of interest rule functions much like an antinepotism policy, which may "forc[e] one spouse to attempt to transfer to another department within [a company] or *to leave the [company's] employ altogether*." (*Waters v. Gaston County, N.C., supra*, 57 F.3d at p. 426, italics added.) The conflict of interest rule "is not rendered invalid simply because some persons who might otherwise have married were deterred by the rule or because *some who did marry were burdened thereby*." (*Jobst, supra*, 434 U.S at p. 54 [98 S.Ct. at p. 99], italics added.)

Further, the conflict of interest rule serves LAPRA's legitimate interests, which are similar to those of an antinepotism policy. Such a policy may be "necessary to . . . avoid potential conflicts that might arise when two closely related persons allow their personal lives to impinge on their professional lives . . . ." (*Wright v. MetroHealth Medical Center* (6th Cir. 1995) 58 F.3d 1130, 1136.) An antinepotism policy is also important in "avoiding conflicts of interest between work-related and family-related obligations; reducing favoritism or even the appearance of favoritism; [and] preventing family conflicts from affecting the workplace . . . ." (*Parks, supra*, 43 F.3d at p. 615.)

LAPRA has a legitimate—indeed, a paramount—interest in preventing the improper disclosure of confidential information about LAPD officers and, more specifically, the disclosure of that information to criminals. As Voge realized, Ortiz's relationship with Estrada could jeopardize the personal safety of the officers. Voge believed, and correctly so, that even if Ortiz did not want to disclose any of the officers' information to Estrada, he or others could attempt to get the information through threats, coercion, deceit, or violence.

The California Legislature has also recognized the need to safeguard personal information about law enforcement personnel. Penal Code section 832.7 provides that, subject to certain exceptions, "[p]eace officer personnel records and records maintained by any state or local agency . . . or information obtained from these records, are confidential and shall not be disclosed by the department or agency that employs the peace officer in any criminal or civil proceeding . . . ." (Pen. Code, § 832.7, subd. (a).) And "[e]very person who maliciously, and with the intent to obstruct justice or the due administration of the laws, . . . discloses the residence address or telephone number of any peace officer . . . or that of the spouse or children of these persons, . . . without the authorization of the employing agency, is guilty of a misdemeanor." (Pen. Code, § 146e, subd. (a).)

We conclude that LAPRA's conflict of interest rule is a rational means of pursuing its interests. "[R]easonable regulations that do not significantly

interfere with decisions to enter into the marital relationship may legitimately be imposed." (*Zablocki, supra,* 434 U.S. at p. 386 [98 S.Ct. at p. 681].) To ensure that Ortiz would not divulge confidential information to inmates and to avoid an appearance of impropriety, LAPRA properly exercised its discretion in terminating Ortiz's employment based on her impending marriage to Estrada.

Our analysis is supported by the California Supreme Court's discussion in *Hill, supra,* 7 Cal.4th 1, of the factors to consider in deciding what standard to apply to private, as opposed to public, action. The court pointed out that, unlike access to government opportunities and services, "individuals usually have a range of choice [in the private sector] among landlords, *employers,* vendors and others with whom they deal" (*id.* at pp. 38-39, italics added), suggesting that a deferential standard should apply to the decisions of those entities. Here, Ortiz "was able to choose freely among competing public or private entities in obtaining access to [a job] opportunity." (*Hill, supra,* 7 Cal.4th at p. 39.) Nor is this a case where a private or public entity "controls access to a vitally necessary item" (*ibid.*), which might justify a less deferential standard.

Finally, Ortiz has not shown that "there [were] feasible and effective alternatives to [LAPRA's] conduct which [would] have [had] a lesser impact on privacy interests." (*Hill, supra,* 7 Cal.4th at p. 40.) At her deposition, Ortiz testified that she could have worked in the snack bar or as a receptionist. But Ortiz admitted in discovery that *everyone* employed by LAPRA had access to the officers' confidential files. In fact, Voge and Ortiz discussed whether there were any other positions that did not allow access to the files. Ortiz acknowledged that there were none. And Ortiz never expressed an interest in working as a receptionist or in the snack bar.

In sum, we find that Ortiz's right to marry, as guaranteed by the privacy provision of the California Constitution, was not violated because LAPRA —in response to Ortiz's decision to marry an incarcerated felon—made a rational decision to further legitimate interests: the personal safety and well-being of police officers and their families.

2.-4.*

. . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 1288.

## III

### DISPOSITION

The judgment is affirmed.

Spencer, P. J., and Ortega, J., concurred.

On June 9, 2002, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied September 25, 2002. Kennard, J., was of the opinion that the petition should be granted.